Filed in Douglas District Court
***EFILED***
Case Number: D01CI140006889
Transaction ID: 0001575384
Filing Date: 08/25/2014 01:36:00 PM CDT

## IN THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA

| | | |
|---|---|---|
| CHARLEEN A. PEARCE, an Individual, | ) | Case No: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **COMPLAINT AT LAW** |
| | ) | |
| WERNER ENTERPRISES, INC., a | ) | |
| Nebraska Corporation, and DRIVERS | ) | |
| MANAGEMENT, LLC, a Delaware | ) | |
| Limited Liability Company, | ) | **Jury Trial Demanded** |
| | ) | |
| Defendants. | ) | |

COMES NOW the Plaintiff, Charleen A. Pearce, by and through her attorneys, Brown & Theis LLP and Merrick Law Firm LLC, and for her complaint against Defendant Werner Enterprises, Inc. and Drivers Management, LLC, states and alleges as follows:

### INTRODUCTION

1.      Plaintiff's action against Defendant Werner Enterprises, Inc. is for personal injuries she suffered as the result of a physical attack by one of Werner Enterprises' supervisory employees.  Plaintiff asserts derivative causes of action under Nebraska common law for assault, battery, and intentional infliction of emotional distress, and a direct cause of action for negligent hiring, supervision, and retention.

2.      Plaintiff's action against Defendant Drivers Management, LLC is for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*. ("Title VII"), and the Nebraska Fair Employment Practices Act, Neb. Rev. Stat. 48-1101 *et seq*. ("NFEPA"), and for disability discrimination and retaliation under the Americans with Disabilities Act, 42 U.S.C. §§12101 *et seq*. ("ADA") and NFEPA.

**EXHIBIT A**

## PARTIES

3.      Plaintiff A. Charleen Pearce ("Pearce") is a resident of the state of Alabama.  At all material times, Pearce was employed as a student truck driver by Defendant Drivers Management, LLC.

4.      Defendant Drivers Management, LLC ("Drivers Management") is a Delaware limited liability company with a principal place of business in Nebraska. Drivers Management does business throughout the United States and Nebraska, including Douglas County, Nebraska.

5.      Defendant Werner Enterprises, Inc. ("Werner Enterprises") is a Nebraska corporation with a principal place of business in Nebraska.  Werner Enterprises is a transportation and logistics company doing business throughout the United States and Nebraska, including Douglas County, Nebraska.

## GENERAL ALLEGATIONS

6.      Robert Helvering ("Helvering") was previously employed by the Union Pacific Railroad Company ("Union Pacific") as a Corridor Manager supervising train dispatchers.

7.      In or about January 2000, several female Union Pacific employees complained to the Human Resources Department that Helvering was sexually harassing them by the way he spoke to them and by touching, fondling or caressing them in the workplace.

8.      Union Pacific investigated the female employees' complaints, counseled Helvering that his conduct must comport with Union Pacific's business conduct policies,

and warned him that any future violation of those policies regarding his treatment of female employees would result in the termination of his employment.

9.      Union Pacific also directed Helvering not to physically touch female employees and not to be alone with female employees.

10.     In or about May 2000, Helvering approached Christine Hampton, a Union Pacific train dispatcher, as she was preparing to leave work for the day and pressured her to speak with him outside of the office.

11.     When they were outside of Union Pacific's office building, Helvering propositioned Ms. Hampton and told her he wanted to touch her, just like any other "red-blooded male would want to touch" her.  He also told her another female employee had filed an EEOC complaint against him but her allegations could not be proven.

12.     Ms. Hampton declined Helvering's advances and walked away.  She subsequently complained about his advances and other inappropriate conduct to Union Pacific's human resources department and asked to be transferred out of the region for which Helvering was Corridor Manager.

13.     When Union Pacific's human resources representatives interviewed Helvering about Ms. Hampton's complaint, he admitted he had been alone with her and stated that he "just plain forgot" that he had been directed not to be alone with female employees.

14.     Union Pacific subsequently suspended Helvering pending completion of the investigation of Ms. Hampton's complaints.

15.     During the investigation, another female employee disclosed that Helvering had touched her bare knee on at least one occasion.

3

16.     Union Pacific's managers stated that they believed Helvering was trying to use his supervisory position to get sexual favors from Ms. Hampton.

17.     In or about June 2000, four Union Pacific managers made a consensus decision to terminate Helvering's employment because he had engaged in sexual harassment of Union Pacific's female employees, including making sexual advances toward Ms. Hampton, after having been warned to act appropriately around female employees and not to be alone with any female employee.

18.     In or about November 2000, Helvering sued Union Pacific for wrongful termination in this Court, Judge Joseph S. Troia presiding, Case ID. CI-10-9330380, Docket 997662, alleging that Union Pacific terminated him in retaliation for complaining about female employees' use of inappropriate language and because of gender and age discrimination, not because he had sexually harassed female employees.

19.     On or about January 23, 2004, Helvering applied for a fleet manager dispatcher position with Defendant Werner Enterprises and listed Union Pacific as a former employer on his application.

20.     During the application process, Helvering disclosed to Werner Enterprises that he had been fired from Union Pacific for committing sexual harassment.

21.     On or about February 3, 2004, in a written Order this Court found that Union Pacific had a legitimate and nondiscriminatory reason to terminate Helvering—he had engaged in sexual harassment of female employees.  Accordingly, this Court granted summary judgment in favor of Union Pacific on all claims.

22.    On or about February, 9, 2004, Werner Enterprises hired Helvering as a fleet manager dispatcher even though it knew or should have known that Union Pacific had fired him for sexually harassing female employees.

23.    Werner Enterprises failed to take any preventative measures to ensure that Helvering would not engage in wrongful conduct against women as a Werner Enterprises employee.

24.    Helvering subsequently appealed this Court's decision granting summary judgment against him.

25.    On or about August 30, 2005, the Court of Appeals of Nebraska published its opinion affirming this Court's grant of summary judgment against Helvering, case No. A–04–266, reported at 13 Neb.App. 818, 703 N.W.2d 134 (2005). The opinion describes the details of Helvering's sexual harassment of Union Pacific's female employees. A copy of the opinion is attached as Exhibit A and incorporated herein by reference.

26.    In or about November 2005, an article on "Sexual Harassment" titled "Warning Derails Habitual Sexual Harasser" was published in the Nebraska Employment Law Letter detailing Helvering's sexual harassment of the Union Pacific female employees and Union Pacific's response. A copy of the article is attached as Exhibit B and incorporated herein by reference.

27.    Werner Enterprises was aware of the Court of Appeals' opinion and the Nebraska Employment Law Letter article but nevertheless failed to take any preventative measures to ensure that Helvering would not engage in wrongful conduct against women as a Werner Enterprises employee.

28.     On or about April 11, 2008, a woman called Werner Enterprises and asked to leave a message for the head of human resources.  The employee who answered the call took the following message:

> Asked for the head of HR to leave the following message:  "She was a driver but hasn't worked for us for at least a year.  She knows we're oblivious to what's going on so she's calling to tell us that dispatcher, Robert Helvering, is using his position to procure women while on the job.  He looks like an upstanding all American guy but he's not what you think.  Somebody needs to monitor him and see what he's about.  He works from home sometimes so it's probably easier for him to do it from there but he's still doing Werner's business when he's doing it from home."

> She blurted it all out and hung up quickly.

29.     The phone message was given to Chris Polenz ("Polenz"), Associate Vice President of Human Resources.

30.     Polenz then forwarded the phone message to Kristina Hoffman ("Hoffman"), Defendant's Assistant Director of Human Resources and Employee Relations and Training.

31.     Polenz told Hoffman that he was not going to give much weight to an anonymous complaint, however, he acknowledged that Helvering's sexual harassment at Union Pacific had made an edition of the Nebraska Employment Law Letter.  Polenz told Hoffman to save the message and "start a file" on Helvering.

32.     Despite receiving the warning that Helvering was using his position to procure women while on the job, Werner Enterprises failed to take any preventative measures to ensure that Helvering would not engage in wrongful conduct against women as a Werner Enterprises employee.

6

33.     On February 25, 2011, Werner Enterprises Fleet Manager Ric Rivera contacted human resources representative Susan Martin ("Martin") to let her know that Nancy Hudson, a former driver on his driver board, had complained to him that Helvering, her current Fleet Manager, was asking her to give him back rubs.

34.     Martin subsequently interviewed Ms. Hudson who advised her that she was not getting enough miles from Helvering.  She also advised Martin that Helvering called her from his home, made inappropriate comments to her, and propositioned her.

35.     Ms. Hudson subsequently advised Martin that she and Helvering had resolved the issue so there was no need to pursue her complaint.

36.     On or about April 8, 2011, Werner Enterprises Manager of Student Drivers Paul Kwaak ("Kwaak") contacted Martin to let her know that Kimberly Hankins, one of his former student drivers, had complained about Helvering's conduct.

37.     Martin subsequently interviewed Ms. Hankins who advised her that Helvering had requested that she be placed on his driver board where, according to Helvering, she could make more money.  Ms. Hankins also said Helvering had sexually harassed her, including propositioning her over the phone while he was away on vacation.

38.     On or about April 11, 2011, Ms. Hankins called Martin and advised her that she had discovered on the Internet that Union Pacific had fired Helvering for committing sexual harassment.  Martin said she would pass along this information to her supervisor.

39.     Ms. Hankins took a leave of absence and decided not to return to work.

40.     On or about April 28, 2011, Hoffman and Martin met with Helvering. During that meeting Helvering advised them that he called some drivers from home and bought dinner for some drivers outside of the office as part of his job as Fleet Manager. Defendant did not direct Helvering to stop calling drivers from home or stop buying them dinner outside the office.

41.     Helvering also told Hoffman and Martin that he had been fired from Union Pacific for engaging in sexual harassment.  He told them he had disclosed this information to Werner Enterprises before he was hired.  When Helvering offered to tell them details about his conduct at Union Pacific, they advised him that that was unnecessary.

42.     Despite Ms. Hudson's and Ms. Hankins' complaints about Helvering's inappropriate conduct, Helvering's admission that he was fired from Union Pacific for sexually harassing women, and his admission that he called drivers from home and took them out to dinner, Werner Enterprises failed to take any preventative measures to ensure that he would not engage in wrongful conduct against women as a Werner Enterprises employee.

43.     On or about January 23, 2013, Plaintiff Charleen Pearce commenced employment with Drivers Management, LLC as a student truck driver.

44.     From the outset of her employment, Pearce was sexually harassed and subjected to a hostile work environment.

45.     Pearce's initial trainer, Jeff Weaver, engaged in inappropriate conduct including, but not limited to, the following: he sometimes wore only his underwear while in the truck with Pearce; he asked her to rub ointment on his back while wearing only his

8

underwear; he stood by the shower room door while she showered; he told her his previous female trainee showered with him; he told her she would have to stay at his home instead of a hotel when they were off work; and he tried to separate her from her boyfriend in order to have an intimate relationship with her.

46.     After Pearce complained that Jeff Weaver was sexually harassing her, in or about February 2013 Pearce was reassigned to a new driver-trainer, Mary Cunningham ("Cunningham").

47.     Pearce continued to be subjected to a sexually hostile work environment while working under Cunningham.

48.     Cunningham frequently made sexually-explicit comments to Pearce.

49.     Cunningham suggested that Pearce should have sex with her.

50.     Cunningham frequently had sexually-explicit cell phone conversations with other trainers and drivers in Pearce's presence.

51.     Cunningham exchanged sexually-explicit text messages and photos ("sexting") with other trainers and drivers in Pearce's presence.

52.     When Cunningham drove the truck she dictated sexually-explicit messages and had Pearce text them to other trainers and drivers for her.

53.     One of the trainers Cunningham had been sexting with began making sexual advances toward Pearce.

54.     While with Pearce Cunningham met with other trainers and drivers to have sex.

55.     Cunningham and Pearce were on Helvering's drivers board.  As such, he was responsible for routing their truck.

56.     Helvering and Cunningham engaged in flirtatious communications. Helvering texted a photo of himself to Cunningham and asked her and Pearce to text him photos of themselves.

57.     Helvering referred to Cunningham and Pearce as "MILF's," a slang acronym for "Mother I'd like (to) Fuck."

58.     Helvering told Cunningham he was having marital problems.

59.     On or about March 1, 2013, Cunningham called Helvering and told him she and Pearce needed showers. He told them to shower at the Denver terminal before coming to Omaha because he needed his "filly team clean."

60.     On or about March 4, 2013, Helvering met Cunningham and Pearce for lunch at Werner Enterprises' cafeteria in Omaha. He also made plans to take them out to dinner that night.

61.     Helvering subsequently told Cunningham that he would meet her at Cunningham's and Pearce's hotel room to discuss giving Cunningham more miles, which would result in increased compensation for her.

62.     Later that day, Helvering entered Cunningham's and Pearce's hotel room with his pants partially unzipped. He closed the door and locked the deadbolt.

63.     Helvering sat down on Cunningham's bed and began discussing giving her more miles. After telling Cunningham he could give her 5,000 miles a week, he approached her and began kissing and groping her.

64.     Cunningham pushed Helvering back and told him he was married.

65.     Helvering approached Cunningham again and kissed her and groped her breasts and buttocks.

10

66.     When Pearce began making noise to distract Helvering, Cunningham pulled away from him and repeated that he was married.  He began kissing her again and said he was only married on paper.

67.     Cunningham pushed Helvering back and told him he was not going to do this in front of her trainee.

68.     Helvering then looked at Pearce and said she and Cunningham were his "team MILF."

69.     Helvering then approached Pearce.  She stood up and took a defensive position to make it more difficult for him to pin her on her bed.

70.     Helvering forcefully grabbed one of Pearce's breasts.

71.     After Pearce pushed Helvering back he approached her again.

72.     Cunningham then yelled at Helvering to stop and told Pearce to get outside, which she did.

73.     Cunningham and Helvering exited the hotel room approximately 20 minutes later.  Cunningham told Pearce they still had to go out to dinner with Helvering.

74.     Helvering then approached Pearce again and forcefully grabbed her arm and pulled her closer so they were face to face.  In a threatening manner, he told Pearce that all they did in the hotel room was kiss and hug.

75.     Pearce and Cunningham had scratches and bruises from Helvering's attack.

76.     During dinner, Helvering told Pearce and Cunningham that he had been invited to the cabin of C.L. Werner, Defendant's founder and owner, and that only Mr. Werner's good friends are invited to his cabin.

77.     Later that night, Pearce reported the attack to Defendant's security personnel and the police.  She also complained about Cunningham's conduct.

78.     On or about March 5, 2013, the sheriff arrested Helvering.  He was criminally charged for the attack and subsequently entered into a plea agreement.

79.     On or about March 5, 2013, Polenz interviewed Helvering about the attack.  Helvering admitted he asked Cunningham to stick her hand down his pants after she had asked for more miles.  Polenz finally advised Helvering that his employment was terminated for violating Defendant's sexual harassment policy.

80.     On or about March 20, 2013, Pearce attempted to return to work from medical leave with a new trainer, Tammy Budhraj ("Budhraj").

81.     Budhraj harassed Pearce and accused her of framing Helvering.

82.     On or about April 16, 2013, Pearce advised Drivers Management that she needed to go back on medical leave for psychiatric treatment, including medication, because of Helvering's attack which also exacerbated emotional injuries she had sustained earlier in her life.

83.     Pearce subsequently filed timely charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and exhausted her federal and state administrative remedies.

84.     On or about May 13, 2013, Drivers Management received notice from the EEOC that Pearce had filed a charge of discrimination.

85.     On or about May 15, 2013, Drivers Management terminated Pearce's employment while she was on medical leave.

12

## COUNT I

### ASSAULT ASSERTED AGAINST WERNER ENTERPRISES

86.     Plaintiff incorporates by reference paragraphs 3 through 85 as though fully set forth in this first cause of action.

87.     Helvering assaulted Pearce when he approached her and grabbed her breast inside the hotel room and approached her and grabbed her arm outside the hotel room, in that he made wrongful attempts with force or threats in a menacing manner with the intent to inflict bodily injury and present apparent ability to give effect to the attempts.

88.     Werner Enterprises allowed Helvering to be in a position to carry out his attack by hiring him into a supervisory position and allowing him to contact female employees from home and take them out to dinner.

89.     In light of Helvering's repeated wrongful conduct against women while employed by Union Pacific and as Werner Enterprises' employee including, but not limited to, propositioning and physically touching women, his wrongful conduct towards Pearce was reasonably foreseeable.

90.     As a direct and proximate cause of Helvering's wrongful conduct, Pearce suffered personal injuries.

91.     Werner Enterprises is vicariously liable for Helvering's wrongful conduct.

## COUNT II

### BATTERY ASSERTED AGAINST WERNER ENTERPRISES

92.     Plaintiff incorporates by reference paragraphs 3 through 89 as though fully set forth in this second cause of action.

93.     Helvering committed battery against Pearce by grabbing her breast and arm, in that he actually inflicted unconsented contact and injury upon her.

94.     As a direct and proximate cause of Helvering's wrongful conduct, Pearce suffered personal injuries.

95.     Werner Enterprises is vicariously liable for Helvering's wrongful conduct.

**COUNT III**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
ASSERTED AGAINST WERNER ENTERPRISES**

96.     Plaintiff incorporates by reference paragraphs 3 through 89 as though fully set forth in this third cause of action.

97.     Helvering's wrongful conduct was intentional or reckless.

98.     Helvering's wrongful conduct was so outrageous in character and so extreme in degree as to go beyond all bounds of decency and is regarded as atrocious and intolerable in a civilized community.

99.     Helvering's wrongful conduct caused Pearce to suffer emotional distress so severe that no reasonable person should be expected to endure it.

100.    As a direct and proximate cause of Helvering's wrongful conduct, Pearce suffered personal injuries.

101.    Werner Enterprises is vicariously liable for Helvering's wrongful conduct.

**COUNT IV**

**NEGLIGENCE ASSERTED AGAINST WERNER ENTERPRISES**

102.    Plaintiff incorporates by reference paragraphs 3 through 89 as though fully set forth in this fourth cause of action.

103.    Defendant owed Pearce a duty of care to protect her from harm caused by its employees, including Helvering.

104.    Defendant knew or should have known that Helvering posed a risk of harm to women with whom he interacted in the scope of his employment, including making sexual advances towards them and physically touching them.

105.    Werner Enterprises breached its duty of care in one or more of the following particulars:

a.      In negligently hiring Helvering into a dispatcher position which allowed him to continue making sexual advances towards women despite the fact that Werner Enterprises knew or should have known with reasonable screening that Union Pacific had fired him for repeatedly engaging in similar wrongful conduct after having been warned to stop;

b.      In negligently supervising Helvering by failing to monitor his conduct towards women; failing to warn, train and counsel him regarding his conduct towards women; allowing him to continue contacting women from home and buying them dinner; and failing to discipline and/or warn him after receiving complaints that he engaged in wrongful conduct towards women; and

c.      In negligently retaining Helvering as an employee after he repeatedly engaged in wrongful conduct towards women both as an employee of Union Pacific and as an employee of Defendant.

106.    As a direct and proximate cause of Werner Enterprises' negligence, Pearce suffered personal injuries.

## COUNT V

### TITLE VII HOSTILE WORK ENVIRONMENT CLAIM
### ASSERTED AGAINST DRIVERS MANAGEMENT, LLC

107.    Plaintiff incorporates by reference paragraphs 3 through 89 as though fully set forth in this fifth cause of action.

108.    Drivers Management subjected Pearce to unwelcome and offensive sexual harassment which was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive work environment in violation of Title VII.

109.    The hostile work environment culminated in the termination of Pearce's employment.

110.    Drivers Management acted with malice and reckless indifference to Pearce's federally-protected rights.

111.    As a direct and proximate result of Driver Management's unlawful conduct, plaintiff suffered damages.

## COUNT VI

### NFEPA HOSTILE WORK ENVIRONMENT CLAIM
### ASSERTED AGAINST DRIVERS MANAGEMENT, LLC

112.    Plaintiff incorporates by reference paragraphs 3 through 89 as though fully set forth in this sixth cause of action.

113.    Drivers Management subjected Pearce to unwelcome and offensive sexual harassment which was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive work environment in violation of NFEPA.

16

114.    The hostile work environment culminated in the termination of Pearce's employment.

115.    As a direct and proximate result of Driver Management's unlawful conduct, plaintiff suffered damages.

## COUNT VII

### TITLE VII RETALIATION CLAIM
### ASSERTED AGAINST DRIVERS MANAGEMENT, LLC

116.    Plaintiff incorporates by reference paragraphs 3 through 89 as though fully set forth in this seventh cause of action.

117.    Drivers Management retaliated against Pearce in violation of Title VII by terminating her employment because she had complained about sexual harassment.

118.    Defendant acted with malice and reckless indifference to Pearce's federally-protected rights.

119.    As a direct and proximate result of Driver Management's unlawful conduct, plaintiff suffered damages.

## COUNT VIII

### NFEPA RETALIATION CLAIM
### ASSERTED AGAINST DRIVERS MANAGEMENT, LLC

120.    Plaintiff incorporates by reference paragraphs 3 through 89 as though fully set forth in this eighth cause of action.

121.    Drivers Management retaliated against Pearce in violation of NFEPA by terminating her employment because she had complained about sexual harassment.

122.    As a direct and proximate result of Driver Management's unlawful conduct, plaintiff suffered damages.

## COUNT IX

### ADA FAILURE TO PROVIDE REASONABLE ACCOMMODATION
### ASSERTED AGAINST DRIVERS MANAGEMENT, LLC

123.    Plaintiff incorporates by reference paragraphs 3 through 89 as though fully set forth in this ninth cause of action.

124.    As a result of Helvering's attack, Pearce had a disability within the meaning of the ADA including, but not limited to, post-traumatic stress disorder.

125.    Pearce was qualified to perform the essential functions of her job with the reasonable accommodation of an appropriate medical leave of absence to recover from her injuries.

126.    Drivers Management violated the ADA by failing to provide Pearce with a sufficient medical leave of absence and instead terminating her employment approximately 30 days after her medical leave commenced.

127.    Providing Pearce with a reasonable accommodation would not have posed an undue hardship to Drivers Management.

128.    Drivers Management acted with malice and reckless indifference to Pearce's federally-protected rights.

129.    As a direct and proximate result of Drivers Management's unlawful conduct, Pearce suffered damages.

## COUNT X

### NFEPA FAILURE TO PROVIDE REASONABLE ACCOMMODATION
### ASSERTED AGAINST DRIVERS MANAGEMENT, LLC

130.    Plaintiff incorporates by reference paragraphs 3 through 89 as though fully set forth in this tenth cause of action.

18

131.    Drivers Management's failure to reasonably accommodate Pearce's disability is also a violation of the Nebraska Fair Employment Practices Act which proximately caused her to suffer damages.

## COUNT XI

### ADA WRONGFUL TERMINATION
### ASSERTED AGAINST DRIVERS MANAGEMENT, LLC

132.    Plaintiff incorporates by reference paragraphs 3 through 89 as though fully set forth in this eleventh cause of action.

133.    Drivers Management violated the ADA by terminating Pearce's employment because she has a disability, has a record of having a disability, and/or Defendant regarded her as having a disability as defined by the ADA.

134.    Drivers Management acted with malice and reckless indifference to Pearce's federally-protected rights.

135.    As a direct and proximate result of Drivers Management's unlawful conduct, Pearce suffered damages.

## COUNT XII

### NFEPA WRONGFUL TERMINATION
### ASSERTED AGAINST DRIVERS MANAGEMENT, LLC

136.    Plaintiff incorporates by reference paragraphs 3 through 89 as though fully set forth in this twelfth cause of action.

137.    Drivers Management violated the NFEPA by terminating Pearce's employment because she has a disability, has a record of having a disability, and/or Defendant regarded her as having a disability as defined by the NFEPA which proximately caused her to suffer damages.

19

## COUNT XIII

### ADA RETALIATION ASSERTED
### AGAINST DRIVERS MANAGEMENT, LLC

138.     Plaintiff incorporates by reference paragraphs 3 through 89 as though fully set forth in this thirteenth cause of action.

139.     Drivers Management violated the ADA by retaliating against Pearce because she had engaged in the protected conduct of requesting reasonable accommodations for her disability.

140.     Drivers Management acted with malice and reckless indifference to Pearce's federally-protected rights.

141.     As a direct and proximate result of Drivers Management's unlawful conduct, Pearce suffered damages.

## COUNT XIV

### NFEPA RETALIATION ASSERTED
### AGAINST DRIVERS MANAGEMENT, LLC

142.     Plaintiff incorporates by reference paragraphs 3 through 89 as though fully set forth in this fourteenth cause of action.

143.     Drivers Management violated the NFEPA by retaliating against Pearce because she had engaged in the protected conduct of requesting reasonable accommodations for her disability which proximately caused her to suffer damages.

WHEREFORE, Plaintiff prays for judgment in her favor and against Defendants and for the following relief in amounts to be proven at trial:

A.     Past and future medical expenses;

B.     Compensatory damages for pain and suffering and emotional distress;

20

C.       Lost wages and benefits;

D.       Damages for loss of earning capacity;

E.       Punitive damages;

F.       Pre-judgment interest;

G.       Reinstatement and/or front pay;

H.       Plaintiff's reasonable attorneys' fees and costs incurred herein; and

I.       For such further relief that the Court may deem just and equitable.


**JURY DEMAND**

Plaintiff demands trial by jury on all issues herein.


CHARLEEN PEARCE

By: _____

One of Plaintiff's Attorneys


Ronald Brown, #15354
Brown & Theis, LLP
11640 Arbor Street, Suite 203
Omaha, NE 68144
Tel: (402) 932-7555
Fax: (402) 932-7556
ron@browntheis.com

Michael J. Merrick, #19855
Merrick Law Firm LLC
3801 Harney Street, Suite 100
Omaha, NE 68131
Tel: (402) 933-4256
Fax: (312) 269-0800
merrick@merricklawfirm.com

21

Westlaw

703 N.W.2d 134                                                                      Page 1
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

C

Court of Appeals of Nebraska.
Robert HELVERING, appellant,
v.
UNION PACIFIC RAILROAD COMPANY, appel-
lee.

No. A–04–266.
Aug. 30, 2005.

**Background:** Male employee who allegedly sexually
harassed female employees brought wrongful termi-
nation action against employer, alleging retaliation,
gender discrimination, and age discrimination. The
District Court, Douglas County, Joseph S. Troia, J.,
granted employer's motion for summary judgment.
Employee appealed.

**Holdings:** The Court of Appeals, Irwin, J. held that:
(1) employer demonstrated a legitimate nondiscrimi-
natory basis for terminating employee;
(2) employee did not establish prima facie case of
gender discrimination; and
(3) employee did not establish prima facie case of age
discrimination.

Affirmed.

West Headnotes

**[1] Appeal and Error 30 ☞934(1)**

30 Appeal and Error
    30XVI Review
        30XVI(G) Presumptions
            30k934 Judgment
                30k934(1) k. In general. Most Cited
Cases

In reviewing a summary judgment, an appellate
court views the evidence in a light most favorable to
the party against whom the judgment is granted and
gives such party the benefit of all reasonable infer-
ences deducible from the evidence.

**[2] Judgment 228 ☞185(2)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185 Evidence in General
                228k185(2) k. Presumptions and burden
of proof. Most Cited Cases

**Judgment 228 ☞185(5)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185 Evidence in General
                228k185(5) k. Weight and sufficiency.
Most Cited Cases

The party moving for summary judgment has the
burden to show that no genuine issue of material fact
exists and must produce sufficient evidence to
demonstrate that the moving party is entitled to
judgment as a matter of law.

**[3] Civil Rights 78 ☞1104**

78 Civil Rights
    78II Employment Practices
        78k1102 Constitutional and Statutory Provi-
sions
            78k1104 k. Purpose and construction in
general. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT A

703 N.W.2d 134                                                                                          Page 2
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

(Formerly 361k226)

The Nebraska Fair Employment Practice Act (FEPA) is patterned from part of the Civil Rights Act of 1964, and it is appropriate to look to federal court decisions construing similar and parent federal legislation. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e; Neb.Rev.St. § 48–1101 et seq.

**[4] Civil Rights 78 ☞1744**

78 Civil Rights
   78V State and Local Remedies
      78k1742 Evidence
         78k1744 k. Employment practices. Most Cited Cases

In an employment discrimination or retaliation action, plaintiff bears the burden to first prove to the fact finder by a preponderance of the evidence a prima facie case of discrimination.

**[5] Civil Rights 78 ☞1744**

78 Civil Rights
   78V State and Local Remedies
      78k1742 Evidence
         78k1744 k. Employment practices. Most Cited Cases

If the plaintiff in an employment discrimination or retaliation action proves a prima facie case, the defendant has the burden to articulate a legitimate nondiscriminatory reason for the employment decision to rebut the inference of discrimination raised by the plaintiff's prima facie claims.

**[6] Civil Rights 78 ☞1744**

78 Civil Rights
   78V State and Local Remedies

Once a defendant accused of employment discrimination or retaliation produces a nondiscriminatory reason for the employment decision, the plaintiff has the burden to prove by a preponderance of the evidence that the legitimate reason offered by the defendant was but a pretext for discrimination.

**[7] Civil Rights 78 ☞1744**

78 Civil Rights
   78V State and Local Remedies
      78k1742 Evidence
         78k1744 k. Employment practices. Most Cited Cases

At all times during an employment discrimination or retaliation action, the plaintiff retains the ultimate burden of persuading the fact finder that he has been the victim of intentional impermissible conduct.

**[8] Civil Rights 78 ☞1137**

78 Civil Rights
   78II Employment Practices
      78k1137 k. Motive or intent; pretext. Most Cited Cases

It is incumbent upon an employee claiming employment discrimination or retaliation to prove not only falsity of the proffered reasons given by the employer, but also that discriminatory motive was the true reason for the discharge.

**[9] Civil Rights 78 ☞1744**

78 Civil Rights
   78V State and Local Remedies

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

78k1742 Evidence

78k1744 k. Employment practices. Most Cited Cases

The trier of fact in an employment discrimination or retaliation action may rely on inferences rather than direct evidence of intentional acts, but intent must be proven by a preponderance of the evidence, whether direct, circumstantial, or otherwise.

**[10] Civil Rights 78 ⬡1244**

78 Civil Rights

78II Employment Practices

78k1241 Retaliation for Exercise of Rights

78k1244 k. Activities protected. Most Cited Cases

Term "practice," as used in Nebraska Fair Employment Practice Act (FEPA) provision making it unlawful for an employer to discriminate against an employee because he has opposed any practice unlawful under federal law or the laws of Nebraska, refers to an unlawful practice of the employer, not unlawful or prohibited actions of coemployees. Neb.Rev.St. § 48–1114(3).

**[11] Civil Rights 78 ⬡1118**

78 Civil Rights

78II Employment Practices

78k1118 k. Practices prohibited or required in general; elements. Most Cited Cases

**Civil Rights 78 ⬡1244**

78 Civil Rights

78II Employment Practices

78k1241 Retaliation for Exercise of Rights

78k1244 k. Activities protected. Most Cited Cases

**Civil Rights 78 ⬡1247**

78 Civil Rights

78II Employment Practices

78k1241 Retaliation for Exercise of Rights

78k1247 k. Discharge or layoff. Most Cited Cases

The Nebraska Fair Employment Practice Act (FEPA) is not a general bad acts statute, and there are many abuses not proscribed by FEPA-type legislative acts, including discharge for opposition to racial discrimination by other employees against the public and discharge for opposition to discrimination based on an employee's sexual orientation. Neb.Rev.St. § 48–1101 et seq.

**[12] Labor and Employment 231H ⬡771**

231H Labor and Employment

231HVIII Adverse Employment Action

231HVIII(A) In General

231Hk770 Exercise of Rights or Duties; Retaliation

231Hk771 k. In general. Most Cited Cases

Elements of a prima facie case for retaliation are that (1) employee was engaging in a protected activity, (2) he or she suffered an adverse employment decision, and (3) there was a causal link between the protected activity and the adverse employment decision.

**[13] Civil Rights 78 ⬡1244**

78 Civil Rights

78II Employment Practices

78k1241 Retaliation for Exercise of Rights

78k1244 k. Activities protected. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134

13 Neb.App. 818, 703 N.W.2d 134

**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

Page 4

An employee is not required to prove the merits of the underlying discrimination charge which forms the basis for the alleged retaliatory treatment so long as the employee possessed a good faith belief that the offensive conduct violated the law.

**[14]** Civil Rights 78 ⬤→1244

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1244 k. Activities protected. Most Cited Cases

An individual who has opposed discriminatory employment practices is protected by a provision of the Nebraska Fair Employment Practice Act (FEPA) making it unlawful for an employer to discriminate against an employee because he has opposed any practice unlawful under federal law or the laws of Nebraska. Neb.Rev.St. § 48–1114(1).

**[15]** Civil Rights 78 ⬤→1242

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1242 k. In general. Most Cited Cases

The evil addressed by provision of the Nebraska Fair Employment Practice Act (FEPA), making it unlawful for an employer to discriminate against an employee because he has opposed any practice unlawful under federal law or the laws of Nebraska, is the exploitation of the employer's power over the employee when used to coerce the employee to endorse, through participation or acquiescence, the unlawful acts of the employer. Neb.Rev.St. § 48–1114(3).

**[16]** Civil Rights 78 ⬤→1244

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1244 k. Activities protected. Most Cited Cases

An employee's opposition to any unlawful act of the employer, whether or not the employer pressures the employee to actively join in the illegal activity, is protected by provision of the Nebraska Fair Employment Practice Act (FEPA) making it unlawful for an employer to discriminate against an employee because he has opposed any practice unlawful under federal law or the laws of Nebraska. Neb.Rev.St. § 48–1114(3).

**[17]** Civil Rights 78 ⬤→1247

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1247 k. Discharge or layoff. Most Cited Cases

Male employee's termination after he sent employer an e-mail message complaining about female employees using inappropriate language was "adverse employment decision," for purposes of demonstrating the adverse employment decision element of prima facie case of retaliatory termination.

**[18]** Civil Rights 78 ⬤→1744

78 Civil Rights
    78V State and Local Remedies
        78k1742 Evidence
            78k1744 k. Employment practices. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134

Page 5

13 Neb.App. 818, 703 N.W.2d 134

**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

Assuming that male employee's e-mail message to employer constituted a complaint that employer was allowing a hostile working environment by allowing female employees to use inappropriate language, the temporal proximity between e-mail message and employee's termination for sexually harassing a different female employee was sufficient evidence to circumstantially establish causal connection needed to complete employee's prima facie case of retaliatory termination, where employee sent e-mail fewer than three weeks before he was terminated.

**[19] Civil Rights 78 ⟨⟩1247**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1247 k. Discharge or layoff. Most Cited Cases

Employer that terminated male employee for suspicion of sexual harassment demonstrated a legitimate nondiscriminatory basis for terminating employee, and thus satisfied burden of rebutting employee's claim of retaliatory termination; supervisor testified employee was warned not to put himself in precarious position after previous allegation of inappropriate behavior and employee subsequently told inappropriate story to female co-worker, and placed his hand on female co-worker's knee, and vice-president of employer's dispatching center testified that female co-worker requested not to work with employee again.

**[20] Civil Rights 78 ⟨⟩1251**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1251 k. Motive or intent; pretext. Most Cited Cases

**Civil Rights 78 ⟨⟩1252**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1252 k. Causal connection; temporal proximity. Most Cited Cases

Employer's legitimate nondiscriminatory reason for terminating male employee, that being suspicion of sexual harassment, was not a pretext for retaliation, where employee presented no evidence, other than the temporal proximity between the alleged protected activity and the adverse employment action, to suggest that the real reason employer terminated his employment was discriminatory and not legitimate.

**[21] Civil Rights 78 ⟨⟩1252**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1252 k. Causal connection; temporal proximity. Most Cited Cases

Although employee asserting retaliation claim may attempt to establish intentional discrimination by showing that the employer's proffered explanation for challenged action is unworthy of credence and the trier of fact may consider the evidence establishing the prima facie case, where temporal proximity is the only evidence establishing causality, such temporal proximity alone is usually insufficient to establish pretext.

**[22] Civil Rights 78 ⟨⟩1179**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1179 k. Discrimination against men; reverse discrimination. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134                                                                      Page 6
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

Male employee did not establish prima facie case of gender discrimination against employer after he was fired for sexual harassment; employee was a member of the majority class of male employees, and employee failed to demonstrate any similarly situated female employees were treated differently.

**[23] Civil Rights 78 ☞1744**

78 Civil Rights
    78V State and Local Remedies
        78k1742 Evidence
          78k1744 k. Employment practices. Most Cited Cases

It is the plaintiff employee's burden to first demonstrate a prima facie case of gender discrimination.

**[24] Civil Rights 78 ☞1166**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
          78k1166 k. Practices prohibited or required in general; elements. Most Cited Cases

A prima facie case of gender discrimination requires the plaintiff to prove that he or she (1) is a member of a protected class, (2) was qualified to perform the job, (3) suffered an adverse employment action, and (4) was treated differently from similarly situated persons of the opposite sex.

**[25] Civil Rights 78 ☞1233**

78 Civil Rights
    78II Employment Practices
        78k1232 Reverse Discrimination
          78k1233 k. In general. Most Cited Cases

In reverse discrimination cases, the first element of the prima facie case is modified to require proof that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.

**[26] Civil Rights 78 ☞1179**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
          78k1179 k. Discrimination against men; reverse discrimination. Most Cited Cases

Male employee alleging reverse gender discrimination following his termination failed to satisfy first element of prima facie case, that employer was the unusual employer who discriminated against male employees; there was no evidence suggesting any background circumstances supporting a suspicion that employer tended to discriminate against males.

**[27] Civil Rights 78 ☞1179**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
          78k1179 k. Discrimination against men; reverse discrimination. Most Cited Cases

Male employee's termination for suspicion of sexual harassment was "adverse employment action," for purposes of demonstrating the adverse employment action element of prima facie case of gender discrimination.

**[28] Civil Rights 78 ☞1179**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134

13 Neb.App. 818, 703 N.W.2d 134

**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

78k1179  k. Discrimination against men; reverse discrimination. Most Cited Cases

Male employee terminated after second investigation of sexual harassment was not similarly situated to female co-workers who were not terminated after being accused of using inappropriate language in presence of male employee, and thus male employee did not receive the requisite disparate treatment from that of female employees to establish prima facie case of gender discrimination; female employees did not have the same supervisor and were not subject to the same standards as the male employee, and male employee had previously been accused of, and investigated for, sexual harassment, whereas there were no complaints or investigations regarding the female employees.

**[29] Civil Rights 78 ☞1172**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1172 k. Disparate treatment. Most Cited Cases

The test to determine whether employees are similarly situated to warrant a comparison to a plaintiff in a gender discrimination action is a rigorous one; specifically, the individuals used for comparison must have dealt with the same supervisor, been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.

**[30] Civil Rights 78 ☞1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate treatment. Most Cited Cases

For discriminatory discipline claims, employees are considered similarly situated when they are involved in or accused of the same offense and are disciplined in different ways.

**[31] Civil Rights 78 ☞1033(1)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1030 Acts or Conduct Causing Deprivation
            78k1033 Discrimination in General
                78k1033(1) k. In general. Most Cited Cases

**Civil Rights 78 ☞1743**

78 Civil Rights
    78V State and Local Remedies
        78k1742 Evidence
            78k1743 k. In general. Most Cited Cases

The plaintiff in a gender discrimination action has the burden of demonstrating that there were individuals similarly situated in all relevant aspects to her by a preponderance of the evidence.

**[32] Civil Rights 78 ☞1744**

78 Civil Rights
    78V State and Local Remedies
        78k1742 Evidence
            78k1744 k. Employment practices. Most Cited Cases

It is the plaintiff employee's burden to first demonstrate a prima facie case of age discrimination.

**[33] Civil Rights 78 ☞1201**

78 Civil Rights

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134                                                                                          Page 8
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

78II Employment Practices
  78k1199 Age Discrimination
    78k1201 k. Practices prohibited or required in general; elements. Most Cited Cases

To establish a prima facie case of age discrimination, the plaintiff must establish that (1) he or she was in the protected group, (2) he or she was subjected to an adverse employment action, (3) he or she was qualified for the employment position or benefit adversely denied, and (4) other similarly situated persons not in the protected group were treated differently.

**[34] Civil Rights 78 ⟬⟭ 1201**

78 Civil Rights
  78II Employment Practices
    78k1199 Age Discrimination
      78k1201 k. Practices prohibited or required in general; elements. Most Cited Cases

Under Act Prohibiting Unjust Discrimination in Employment Because of Age, it is unlawful to discriminate against a person who is at least 40 but fewer than 70 years of age, unless such age distinction is made for legitimate and reasonable purposes. Neb.Rev.St. § 48–1001.

**[35] Civil Rights 78 ⟬⟭ 1204**

78 Civil Rights
  78II Employment Practices
    78k1199 Age Discrimination
      78k1204 k. Discharge or layoff. Most Cited Cases

Forty-eight-year old male employee's termination for suspicion of sexual harassment was "adverse employment action," for purposes of demonstrating adverse employment action element of prima facie case of age discrimination.

**[36] Civil Rights 78 ⟬⟭ 1210**

78 Civil Rights
  78II Employment Practices
    78k1199 Age Discrimination
      78k1210 k. Disparate treatment. Most Cited Cases

Forty-eight-year-old male employee, terminated after second accusation of sexual harassment, was not similarly situated to allegedly younger female co-workers who were not terminated after being accused of using inappropriate language in presence of male employee, and thus male employee did not receive the requisite disparate treatment from that of allegedly younger female employees to establish a prima facie case of age discrimination; female employees did not have the same supervisor and were not subject to the same standards as the male employee, and male employee had previously been accused of, and investigated for, sexual harassment, whereas there were no complaints or investigations regarding the female employees.

**[37] Civil Rights 78 ⟬⟭ 1204**

78 Civil Rights
  78II Employment Practices
    78k1199 Age Discrimination
      78k1204 k. Discharge or layoff. Most Cited Cases

Even if 48-year-old male employee, terminated after second accusation of sexual harassment, demonstrated prima facie case of age discrimination, employer demonstrated sufficient legitimate nondiscriminatory basis for terminating employee, where employer believed employee was guilty of sexually harassing a female employee.

**[38] Civil Rights 78 ⟬⟭ 1206**

703 N.W.2d 134                                                                                          Page 9
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

78 Civil Rights
    78II Employment Practices
       78k1199 Age Discrimination
          78k1206 k. Pensions, retirement plans, and
employee benefits. Most Cited Cases

**Civil Rights 78 &#9756;1209**

78 Civil Rights
    78II Employment Practices
       78k1199 Age Discrimination
          78k1209 k. Motive or intent; pretext. Most
Cited Cases

     Even if 48-year-old male employee, terminated
after second accusation of sexual harassment,
demonstrated prima facie case of age discrimination,
employer's legitimate nondiscriminatory reason for
terminating employee, that being suspicion of sexual
harassment, was not a pretext for dismissing em-
ployees once they neared retirement to avoid paying
retiree's pension.

     ***138** *Syllabus by the Court*
  **\*818** 1. **Summary Judgment: Appeal and Er-
ror.** In reviewing a summary judgment, an appellate
court views the evidence in a light most favorable to
the party against whom **\*819** the judgment is granted
and gives such party the benefit of all reasonable in-
ferences deducible from the evidence.

     2. **Summary Judgment: Proof.** The party mov-
ing for summary judgment has the burden to show that
no genuine issue of material fact exists and must
produce sufficient evidence to demonstrate that the
moving party is entitled to judgment as a matter of
law.

     3. **Fair Employment Practices.** The Nebraska
Fair Employment Practice Act, Neb.Rev.Stat. §§
48–1101 to 48–1126 (Reissue 2004), furthers the
policy of Nebraska to foster the employment of all

employable persons in the state on the basis of merit
and to safeguard their right **\*\*139** to obtain and hold
employment without discrimination.

     4. **Fair Employment Practices: Proof.** The
well-known order and allocation of proof and burdens
set forth in *Texas Dept. of Community Affairs v. Bur-
dine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207
(1981), are applicable to discriminatory employment
treatment claims, as well as retaliation claims.

     5. **Fair Employment Practices: Discrimina-
tion: Proof.** The plaintiff in an employment discrim-
ination action bears the burden to first prove to the fact
finder by a preponderance of the evidence a prima
facie case of discrimination.

     6. **Fair Employment Practices: Discrimina-
tion: Proof.** If the plaintiff in an employment dis-
crimination action proves a prima facie case, the de-
fendant has the burden to articulate a legitimate non-
discriminatory reason for the employment decision to
rebut the inference of discrimination raised by the
plaintiff's prima facie claims.

     7. **Fair Employment Practices: Discrimina-
tion: Proof.** Once the defendant in an employment
discrimination action produces a legitimate nondis-
criminatory reason for the employment decision, the
plaintiff then has the burden to prove by a prepon-
derance of the evidence that the legitimate reason
offered by the defendant was but a pretext for dis-
crimination.

     8. **Fair Employment Practices: Discrimina-
tion: Proof.** At all times, the plaintiff in an employ-
ment discrimination action retains the ultimate burden
of persuading the fact finder that he has been the vic-
tim of intentional impermissible conduct.

     9. **Fair Employment Practices: Discrimina-
tion: Intent: Proof.** It is now incumbent upon an

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134
13 Neb.App. 818, 703 N.W.2d 134

Page 10

**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

employee to prove not only falsity of the proffered reasons given by the employer, but also that discriminatory motive was the true reason for the discharge.

10. **Fair Employment Practices: Discrimination: Intent: Proof.** The trier of fact in a discriminatory employment case may rely on inferences rather than direct evidence of intentional acts, but intent must be proven by a preponderance of the evidence, whether direct, circumstantial, or otherwise.

11. **Fair Employment Practices: Discrimination: Actions.** Neb.Rev.Stat. § 20–148 (Reissue 1997) authorizes a private civil cause of action for private acts of discrimination by private employers.

12. **Fair Employment Practices: Discrimination.** The Nebraska Fair Employment Practice Act makes it unlawful for an employer to discriminate against its employee on the basis of the employee's opposition to an unlawful practice.

13. **Fair Employment Practices.** The "unlawful" practices covered by Neb.Rev.Stat. § 48–1114 (Reissue 2004) are activities related to the employment.

14. **Fair Employment Practices: Words and Phrases.** The term "practice" in Neb.Rev.Stat. § 48–1114(3) (Reissue 2004) refers to an unlawful practice of the employer, not unlawful or prohibited actions of coemployees.

**\*820** 15. **Fair Employment Practices: Statutes.** The Nebraska Fair Employment Practice Act is not a general bad acts statute, and there are many abuses not proscribed by legislative acts of the same type, including discharge for opposition to racial discrimination by other employees against the public and discharge for opposition to discrimination based on an employee's sexual orientation.

16. **Fair Employment Practices: Proof.** The

elements of a prima facie case for retaliation are that the plaintiff must **\*\*140** show that (1) he or she was engaging in a protected activity, (2) he or she suffered an adverse employment decision, and (3) there was a causal link between the protected activity and the adverse employment decision.

17. **Fair Employment Practices: Discrimination: Proof.** An employee is not required to prove the merits of the underlying discrimination charge which forms the basis for the alleged retaliatory treatment so long as the employee possessed a good faith belief that the offensive conduct violated the law.

18. **Fair Employment Practices: Discrimination.** An individual who has opposed discriminatory employment practices is protected under Neb.Rev.Stat. § 48–1114(1) (Reissue 2004).

19. **Fair Employment Practices: Discrimination.** Neb.Rev.Stat. § 48–1114(2) (Reissue 2004) prohibits discrimination against an employee who has made a charge under the Nebraska Fair Employment Practice Act.

20. **Fair Employment Practices.** Neb.Rev.Stat. § 48–1104(1) (Reissue 2004) makes it unlawful for an employer to harass any individual because of sex, and Neb.Rev.Stat. § 48–1102(14) (Reissue 1998) includes the creation of a hostile working environment as harassment because of sex.

21. **Fair Employment Practices.** The evil addressed by Neb.Rev.Stat. § 48–1114(3) (Reissue 2004) is the exploitation of the employer's power over the employee when used to coerce the employee to endorse, through participation or acquiescence, the unlawful acts of the employer.

22. **Fair Employment Practices.** An employee's opposition to any unlawful act of the employer, whether or not the employer pressures the employee to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134                                                                    Page 11
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

actively join in the illegal activity, is protected under Neb.Rev.Stat. § 48–1114(3) (Reissue 2004).

23. **Fair Employment Practices: Time.** Sometimes, the timing of one incident of adverse employment action following protected activity suffices to establish causal connection.

24. **Fair Employment Practices: Time.** The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case of retaliation uniformly hold that the temporal proximity must be very close.

25. **Fair Employment Practices: Discrimination: Time.** Although temporal proximity may be sufficient to demonstrate a prima facie case of employment discrimination, temporal proximity alone is not sufficient to satisfy the burden to show pretext.

26. **Fair Employment Practices: Discrimination: Proof.** A prima facie case of gender discrimination requires the plaintiff to prove that he or she (1) is a member of a protected class, (2) was qualified to perform the job, (3) suffered an adverse employment action, and (4) was treated differently from similarly situated persons of the opposite sex.

27. **Fair Employment Practices: Discrimination: Proof.** In reverse discrimination cases, the first element of the prima facie case is modified to require proof that background circumstances support the **\*821** suspicion that the defendant is that unusual employer who discriminates against the majority.

28. **Fair Employment Practices: Discrimination.** In an employment discrimination action, the test to determine whether employees are similarly situated to warrant a comparison to a plaintiff is a rigorous one.

**\*\*141** 29. **Fair Employment Practices: Discrimination.** In an employment discrimination action, the individuals used for comparison must have dealt with the same supervisor, been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.

30. **Fair Employment Practices: Discrimination.** In an employment discrimination action, employees are considered similarly situated when they are involved in or accused of the same offense and are disciplined in different ways.

31. **Fair Employment Practices: Discrimination: Proof.** In an employment discrimination action, the plaintiff has the burden of demonstrating that there were individuals similarly situated in all relevant aspects to her by a preponderance of the evidence.

32. **Fair Employment Practices: Discrimination: Proof.** To establish a prima facie case of age discrimination, the plaintiff must establish that (1) he or she was in the protected group, (2) he or she was subjected to an adverse employment action, (3) he or she was qualified for the employment position or benefit adversely denied, and (4) other similarly situated persons not in the protected group were treated differently.

33. **Fair Employment Practices: Discrimination.** Nebraska's Act Prohibiting Unjust Discrimination in Employment Because of Age, Neb.Rev.Stat. § 48–1001 et seq. (Reissue 2004), makes it unlawful to discriminate against a person who is at least 40 but fewer than 70 years of age, unless such age distinction is made for legitimate and reasonable purposes.

Thomas F. Hoarty, Jr., and Scott A. Calkins, of Byam & Hoarty, Omaha, for appellant.

Marlon A. Polk, Margot J. Wickman, and Dana E. Christian, of Polk, Waldman, Wickman & Council, P.C., L.L.O., Omaha, for appellee.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134                                                                           Page 12
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

IRWIN, SIEVERS, and CASSEL, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Robert Helvering appeals from an order of the district court granting summary judgment to Union Pacific Railroad Company (UP) on Helvering's amended petition alleging that his employment with UP was wrongfully terminated for discriminatory reasons, including retaliation, gender discrimination, and age **\*822** discrimination. Helvering challenges the district court's grant of summary judgment as to each of his claims. We conclude that Helvering failed to satisfy his burden of proof with respect to each of the claims and that UP was therefore entitled to a judgment as a matter of law on each of the claims. Accordingly, we affirm the order of the district court granting UP summary judgment on each of Helvering's claims.

## II. BACKGROUND

Helvering began his employment with UP in 1972. Helvering was transferred to Omaha in August 1990, at which time he was promoted from the position of dispatcher to the position of corridor manager, the direct supervisor of train dispatchers assigned to his area. Prior to 2000, there had been no complaints or disciplinary actions taken against Helvering.

On January 8, 2000, Don Murray, the director of human resources for UP's dispatching center in Omaha, received an electronic mail (e-mail) communication informing him of sexual harassment complaints made against Helvering. Murray **\*\*142** was responsible for investigating complaints regarding alleged violations of UP's business conduct and equal employment opportunity (EEO) policies, and he initially investigated the complaints made against Helvering. As part of that investigation, a meeting was held on March 3, attended by Helvering, Murray, Mark Payne (Helvering's supervisor), and Dennis

Jacobson (the vice president of UP's Omaha dispatching center).

During the meeting on March 3, 2000, the allegations in the complaint were explained to Helvering. Helvering was informed that he "had been seen touching, fondling, [or] caressing females in the workplace." The allegations against Helvering apparently also included "talking in a demeaning manner [and] belittling female train dispatchers," although Helvering denies that he was informed of such allegations. Helvering denied the allegations made against him. Helvering was counseled to make sure his behavior complied with UP's business conduct and EEO policies and warned that any conduct violating the policies would result in termination of his employment.

According to Helvering, he was directed to act in a professional manner with women and all employees at all times, not to **\*823** be involved in any touching of any kind with any employees, to treat others as he would want to be treated, and not to become involved in meetings where just he and a female train dispatcher were present. Helvering testified in a deposition that he told the others at the meeting it was impossible for him, because of his job duties, not to be involved in meetings where just he and a female train dispatcher were present and that he was instructed to "try not to find [him]self in a compromising position." According to Payne, Helvering was instructed "not to touch other employees or meet privately with female employees." According to Jacobson, Helvering was told that "he needed to be very, very careful in his work"; that he should engage in no touching, only business; not to get into any personal issues with anybody; and to stay on business and "not put himself in a position where he [would be] alone with any female employees." Helvering acknowledged that he was told that any further complaints involving his conduct could result in his dismissal from UP.

Payne testified in a deposition that Murray had

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134                                                                                                    Page 13
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

told him that the allegations against Helvering were "not substantiated in [the] investigation." Similarly, Jacobson testified in a deposition that Murray had told him that the allegations against Helvering could not be substantiated. Kathleen Vance, UP's director of EEO and affirmative action, however, testified in a deposition that she did not agree that none of the allegations could be substantiated. Vance testified that what was found was that "there was only one woman who was willing to at that time meet with the EEO manager to follow up on sort of vague allegations." Vance stated, "It was more of personality issues and perhaps some racial insensitivity [concerning that woman, rather than a substantiation of sexual misconduct], but ... as far as [that woman] went, she repeated complaints that she heard from other people, but she herself did not have any sexual harassment complaints...." Vance further testified that "there were certainly a lot of allegations floating around that were difficult to prove, because people were unwilling to come forward and give their names and give their details." According to Vance, however, "there was certainly enough that was being said that was disturbing and was worrisome in terms of the behavior of a person in charge of supervising train dispatchers."

**143 *824** Christine Hampton was hired by UP in September 1999. Hampton was a train dispatcher. Hampton testified in a deposition that in January or February 2000, Hampton was warned by a manager of train dispatchers that Helvering "would probably make a pass at [her]" and that Helvering would retaliate against her when she rejected him. The manager also told Hampton about "other females that [Helvering] had approached, that [he] had touched," and told Hampton about an incident where Helvering allegedly "put his hand on [a woman's] breast" when posing for a photograph.

Hampton testified in a deposition that Helvering told a story during a UP safety meeting in March 2000. Helvering testified in a deposition that he believed the safety meeting occurred in February 2000. According

to Hampton, Helvering prefaced the story by saying that it was a story Hampton "would like." According to Hampton, the story told by Helvering referenced Helvering's "being a referee and seeing a female in the stands wearing a short skirt with no undergarments. He said her legs were spread apart and he couldn't take his attention away from that particular situation." According to Helvering, the story was about a woman in the stands wearing a short skirt, but Helvering specifically denied having said that the story was for Hampton's benefit. Additionally, Vance testified in a deposition that she thought the version of the story she heard from Helvering while investigating this case did not include a "lack of underwear." Helvering testified in a deposition that he told the story as an illustration of the importance of staying focused while working and "just simply ... keep[ing] your mind on what you're doing."

Hampton testified in a deposition that she had been required to "go on a road trip" for UP in March 2000 "to ... visit and ride trains, ride with track inspectors and see the territories of your area that you're dispatching." Hampton testified that it was brought to her attention that Helvering "was telling the corridor managers and directors ... that [Hampton] wanted him to attend this road trip with [her]." Hampton denied ever making such a request, and she informed a director that she "under no circumstances want[ed] to go on a road trip with ... Helvering." Helvering did not accompany Hampton on the trip. Helvering **825** testified in a deposition that he never asked to accompany Hampton on the trip.

Hampton testified in a deposition that on May 25, 2000, as she was preparing to leave work for the day, Helvering asked her whether she had "a few minutes to talk." Hampton testified that she told Helvering she did not have time to talk, but that after Helvering asked a second time, she said, "[O]kay." According to Hampton, Helvering asked to talk "on the patio" or "by the security desk, or out front." According to Hampton, Helvering met her outside the building and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

Page 14

asked, "[W]hat do you think of me?" Hampton testified that she answered Helvering by commenting on his capabilities as a "trainman," but that he asked her again what she thought of him and that her impression was that "he wanted something personal." Hampton testified that she again answered Helvering by commenting on his capabilities as a "trainman." According to Hampton, Helvering continued the conversation by telling Hampton about a female employee who had filed "an [Equal Employment Opportunity Commission] complaint" against him, the allegations of which could not be proven. Hampton recalled that "without taking a breath," Helvering then said to Hampton, "[A]ny red-blooded male would want to touch, I would want to touch you, would you consider **144 meeting me outside of work[?]" Hampton testified that Helvering repeated the comment and again asked her whether they could "meet outside of work." Hampton testified that she said "absolutely not" and walked off.

Helvering testified in a deposition that when he was asked why he met with Hampton alone "after [being] told ... not to," he answered, "I just plain forgot." Helvering testified that Hampton had approached him and asked to talk about something and that they had walked out of the building together. Helvering specifically denied having asked Hampton whether he could touch her or whether they could meet outside of work. The record indicates that there were other employees walking past Helvering and Hampton during this encounter.

Hampton testified in a deposition that she asked "to be moved out of the ... region" where Helvering was corridor manager. Hampton also called Murray and left a voice mail message to **826 that effect on May 25 or 26, 2000. Hampton was interviewed by UP about her allegations against Helvering on May 26. On May 30, Payne and Jacobson met with Helvering to discuss Hampton's complaint. At that meeting, Helvering acknowledged having met with Hampton and was suspended, with pay, pending the outcome of

an investigation into Hampton's complaint.

During the investigation, another female employee of UP alleged that on at least one occasion, Helvering had "placed his hand on her bare knee" at work. That employee, however, did not want the allegation pursued.

On May 28, 2000, Helvering sent an e-mail to Vance and Payne relating incidents of inappropriate language being used by female UP employees in his presence. In the e-mail, Helvering indicated that on May 19, one female employee had "said in a loud voice[,] 'YOU CAN KISS MY ASS.' " Helvering testified in a deposition that the statement was not directed at him and that he reported it to Payne and Vance because he heard that he had been accused of saying something in response and he wanted to provide his position on the statement.

In the e-mail, Helvering also indicated that on May 27, 2000, a female corridor manager had whispered some vulgar "directives" toward him. According to Helvering, the female corridor manager said, "I feel like I've been fucked all night, but when I fuck, I like to have hands-on." Helvering testified in a deposition that the comment was directed at him and was offensive and humiliating but did not interfere with his ability to do his job. Helvering testified that he reported the comment because it "was untimely" and because it was "convenient" to add a report of the comment to his e-mail.

In the e-mail, Helvering also complained about other "sexual n-u-indoes" by a female employee at the workplace. Helvering testified in a deposition that the sexual innuendoes he was referring to were primarily by two female employees. Helvering testified that one of the female employees' job differed from his and that the innuendoes involved laughing and making jokes and included such statements as one female employee's commenting, "I like it hard and fast, bring it on

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

Page 15

hard and fast." Helvering testified that the other female employee's job was the same as his and that "around [19]95" and "during [19]98," the employee **\*827** had commented on UP's "business casual" dress code by saying, "I don't wear underwear anyway, you want to feel?"

The record does not indicate that the female employees mentioned in Helvering's e-mail had been the subject of any **\*\*145** prior complaints. After an investigation, the female employees mentioned in Helvering's e-mail were "disciplined accordingly." Vance testified in a deposition that the female employees were interviewed and provided with a review of EEO policies and counseling about appropriate language in the workplace. Helvering testified in a deposition that he learned that the female employees were "chastised" and that they "promised they would watch themselves from then on."

Helvering testified in a deposition that he met with Payne on May 30, 2000, and that Payne asked Helvering why he had e-mailed Vance. According to Helvering, Payne indicated that if Helvering had not sent the e-mail to Vance, UP "could have handled [Helvering's complaint] internally," but that because he did send the e-mail, UP had "to have a full-blown investigation." Helvering also testified that on some unspecified date when he had met with Murray, Murray had said that Helvering was "a middle-aged white male" and was "very vulnerable."

On June 16, 2000, Helvering's employment with UP was terminated. Payne testified in a deposition that he made the decision to terminate Helvering's employment. Payne testified that the investigation of the March 2000 complaint did not factor into his decision, but that he based his decision on Helvering's having been warned in March 2000 to be very careful and not put himself in a "precarious" position and on Payne's subsequently receiving "a very serious charge in May" that Helvering was making sexual advances toward a female employee. Payne further testified that the fac-

tors upon which he based the decision to terminate Helvering's employment were Helvering's going outside the building with Hampton, Helvering's use of the story during the safety meeting, Hampton's desire to be transferred rather than work with Helvering, and the other female employee's report that Helvering had placed his hand upon her knee. Payne testified that he "saw sexual harassment in the workplace, so [he] made a determination for termination" of Helvering's employment.

**\*828** Jacobson testified in a deposition that the decision to terminate Helvering's employment was a consensus decision. Vance testified in a deposition that the decision about how to respond to the allegations against Helvering was discussed by Vance, Murray, Payne, and Jacobson. Jacobson testified that he believed Hampton and that Helvering was terminated because he had sexually harassed Hampton. Jacobson testified that he believed Helvering was trying to use his position to get sexual favors from Hampton. Payne indicated in an affidavit that the decision to terminate Helvering's employment was not influenced by Helvering's complaints about female employees' using inappropriate language and that Helvering's age and gender were not factors in the decision to terminate Helvering's employment.

On November 1, 2000, Helvering filed an amended petition. In the amended petition, Helvering alleged that his employment had been wrongfully terminated in retaliation for his filing a complaint against the use of inappropriate language by female employees, because of gender discrimination, and because of age discrimination. UP filed an answer on November 15, and Helvering filed a reply on November 20.

On February 3, 2004, the district court entered an order granting UP summary judgment as to each of Helvering's causes of action. The district court found that Helvering had failed to demonstrate a causal connection between the termination of his employ-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment and his complaint about the language used by the female employees,**146** that UP had demonstrated a legitimate nondiscriminatory reason for terminating his employment, and that he had failed to demonstrate that UP's proffered reason for terminating his employment was pretextual; as such, the court granted summary judgment against Helvering on his retaliation claim. The district court found that Helvering had previously been told not to be alone with female employees but had violated that order by being alone with Hampton, that Helvering and the female employees about whom he had complained were not similarly situated, and that he was "not likely" to sustain his gender discrimination claim; as such, the court granted summary judgment against Helvering on his gender discrimination claim. The district court found that Helvering had not obeyed an order not to be alone with female employees, that he had not been replaced by **829** a younger employee, and that he was "not likely" to sustain his age discrimination claim; as such, the court granted summary judgment against Helvering on his age discrimination claim. This appeal followed.

## III. ASSIGNMENTS OF ERROR

On appeal, Helvering has assigned eight errors, which we consolidate for discussion to three. First, Helvering asserts that the district court erred in granting UP summary judgment on his retaliation claim. Second, Helvering asserts that the district court erred in granting UP summary judgment on his gender discrimination claim. Third, Helvering asserts that the district court erred in granting UP summary judgment on his age discrimination claim.

## IV. ANALYSIS

## 1. GENERALLY APPLICABLE PRINCIPLES OF LAW

Although Helvering's assignments of error concern the district court's grant of summary judgment on three different causes of action, each of Helvering's causes of action is premised upon an assertion of discrimination in the decision to terminate his em-

ployment. While each cause of action is separate and unique, the principles of law governing summary judgment proceedings, and some other general principles of law, apply equally to each of the three causes of action.

### (a) Summary Judgment

[1][2] In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Wolfe v. Becton Dickinson & Co.,* 266 Neb. 53, 662 N.W.2d 599 (2003). The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law. *Id.*

### (b) Discrimination Claims

[3] The Nebraska Fair Employment Practice Act (FEPA), Neb.Rev.Stat. §§ 48–1101 to 48–1126 (Reissue 2004), furthers "the **830** policy of [Nebraska] to foster the employment of all employable persons in the state on the basis of merit ... and to safeguard their right to obtain and hold employment without discrimination." § 48–1101. FEPA is patterned from that part of the Civil Rights Act of 1964 contained in 42 U.S.C. § 2000e et seq. (2000), and it is appropriate to look to federal court decisions construing similar and parent federal legislation. See, *Airport Inn v. Nebraska Equal Opp. Comm.,* 217 Neb. 852, 353 N.W.2d 727 (1984); *Zalkins Peerless Co. v. Nebraska Equal Opp. Comm.,* 217 Neb. 289, 348 N.W.2d 846 (1984); **147***Richards v. Omaha Public Schools,* 194 Neb. 463, 232 N.W.2d 29 (1975). See, also, *Rose v. Vickers Petroleum,* 4 Neb.App. 585, 546 N.W.2d 827 (1996).

[4][5][6][7] The well-known order and allocation of proof and burdens set forth in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), are applicable to discriminatory employment treatment claims, as well

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134

Page 17

13 Neb.App. 818, 703 N.W.2d 134

**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

as retaliation claims. *Harris v. Misty Lounge, Inc.,* 220 Neb. 678, 371 N.W.2d 688 (1985); *Rose v. Vickers Petroleum, supra.* The plaintiff bears the burden to first prove to the fact finder by a preponderance of the evidence a prima facie case of discrimination. See, *Texas Dept. of Community Affairs v. Burdine, supra; Rose v. Vickers Petroleum, supra.* If the plaintiff proves a prima facie case, the defendant has the burden to articulate a legitimate nondiscriminatory reason for the employment decision to rebut the inference of discrimination raised by the plaintiff's prima facie claims. See *id.* Once the defendant produces such a reason, the plaintiff then has the burden to prove by a preponderance of the evidence that the legitimate reason offered by the defendant was but a pretext for discrimination. See *id.* At all times, the plaintiff retains the ultimate burden of persuading the fact finder that he has been the victim of intentional impermissible conduct. See *id.* This same analysis has also been referred to as the "*McDonnell Douglas* test," applied in disparate treatment cases. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See, also, *Billingsley v. BFM Liquor Mgmt.,* 264 Neb. 56, 645 N.W.2d 791 (2002) (age discrimination action); *Father Flanagan's Boys' Home v. Agnew,* 256 Neb. 394, 590 N.W.2d 688 (1999) (gender discrimination action).

[8][9] **\*831** The U.S. Supreme Court in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), heightened the employee's burden in discrimination cases. It is now incumbent upon an employee to prove not only falsity of the proffered reasons given by the employer, but also that discriminatory motive was the true reason for the discharge. See *id.* See, also, *Ventura v. State,* 246 Neb. 116, 517 N.W.2d 368 (1994). The trier of fact may rely on inferences rather than direct evidence of intentional acts, but intent must be proven by a preponderance of the evidence, whether direct, circumstantial, or otherwise. See, *Texas Dept. of Community Affairs v. Burdine, supra; Board of Trustees v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Rose v. Vickers Petroleum, supra.*

### 2. RETALIATION CLAIM

Helvering first asserts that the district court erred in granting UP summary judgment on Helvering's claim that UP's termination of his employment was unlawful retaliation. Although we conclude that Helvering satisfied his burden of adducing sufficient evidence to demonstrate a prima facie case of discrimination, we conclude that UP demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment and that Helvering failed to satisfy his burden of demonstrating that the proffered basis was merely pretextual. As such, we conclude that the district court correctly granted UP summary judgment on the retaliation claim.

#### (a) Helvering's Prima Facie Case

It was Helvering's burden to first demonstrate a prima facie case of discrimination. See, *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Rose v. Vickers Petroleum,* 4 Neb.App. 585, 546 N.W.2d 827 (1996). Although we disagree with some factual conclusions reached by **\*\*148** the district court on what we conclude were genuine disputes of fact, we ultimately conclude that the district court correctly made an implicit finding that Helvering satisfied his initial burden, demonstrating a prima facie case of discrimination, by showing that he engaged in arguably protected activity, namely sending an e-mail notifying UP about inappropriate language being used by female employees; by showing that he suffered an **\*832** adverse employment action when his employment was terminated; and by demonstrating circumstantially a causal connection between his activity and the adverse action by virtue of the very close temporal proximity between those two events.

In his amended petition, Helvering asserted that his retaliation claim was brought under Neb.Rev.Stat. § 20–148 (Reissue 1997) and § 48–1114. Section 20–148 authorizes a private civil cause of action for

703 N.W.2d 134
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

Page 18

private acts of discrimination by private employers. See *Cole v. Clarke,* 8 Neb.App. 614, 598 N.W.2d 768 (1999). Section 48–1114 provides, in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his or her employees ... because he or she (1) has opposed any practice made an unlawful employment practice by [FEPA], (2) has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [FEPA], or (3) has opposed any practice or refused to carry out any action unlawful under federal law or the laws of [Nebraska].

[10][11] FEPA makes it unlawful for an employer to discriminate against its employee on the basis of the employee's opposition to an unlawful practice. § 48–1114; *Wolfe v. Becton Dickinson & Co.,* 266 Neb. 53, 662 N.W.2d 599 (2003). The Nebraska Supreme Court has held that the "unlawful" practices covered by § 48–1114 are activities related to the employment. See *Wolfe v. Becton Dickinson & Co., supra.* As such, seen in the context of the entirety of FEPA and in light of the apparent purposes FEPA is meant to serve, the term "practice" in § 48–1114(3) refers to an unlawful practice of the employer, not unlawful or prohibited actions of coemployees. *Wolfe v. Becton Dickinson & Co., supra.* FEPA is not a general bad acts statute, and there are many abuses not proscribed by FEPA-type legislative acts, including discharge for opposition to racial discrimination by other employees against the public and discharge for opposition to discrimination based on an employee's sexual orientation. *Wolfe v. Becton Dickinson & Co., supra.* See, also, *Hamner v. St. Vincent Hosp. and Health Care Center,* 224 F.3d 701 (7th Cir.2000); *Wimmer v. Suffolk County Police Dept.,* 176 F.3d 125 (2d Cir.1999).

[12][13] In analyzing the evidence in a retaliation case, the elements of a prima facie case for retaliation are that the plaintiff **833** must show that (1) he or she was engaging in a protected activity, (2) he or she

suffered an adverse employment decision, and (3) there was a causal link between the protected activity and the adverse employment decision. *Rose v. Vickers Petroleum,* 4 Neb.App. 585, 546 N.W.2d 827 (1996). See *Wolfe v. Becton Dickinson & Co., supra* (prima facie case consists of discharge following protected activity of which employer was aware). See, also, *Ruggles v. California Polytechnic State University,* 797 F.2d 782 (9th Cir.1986). Although there is authority to the contrary, the majority view is that an employee is not required to prove the merits of the underlying discrimination charge which forms the basis for the alleged**149** retaliatory treatment so long as the employee possessed a good faith belief that the offensive conduct violated the law. *Rose v. Vickers Petroleum, supra.* See *Wolfe v. Becton Dickinson & Co., supra* (belief must be reasonable but need not necessarily be correct to form underlying basis for retaliation claim).

Helvering asserted that the termination of his employment was motivated by his complaint that female employees were using inappropriate language. The district court found that this assertion was "an unsupported allegation," that UP had sufficient reason to terminate Helvering's employment before he made the complaint, and that Helvering failed to meet his burden to show that UP's reason for terminating his employment was pretextual. The issues on appeal are whether the evidence presented to the district court demonstrates a genuine issue of material fact concerning the elements of Helvering's retaliation claim and whether UP was entitled to judgment as a matter of law.

*(i) Protected Activity*

It is not entirely clear what protected activity Helvering is alleging he engaged in to form the underlying basis for his retaliation claim. His petition referenced only § 48–1114(3), and his argument on appeal references only his "complaint" in an e-mail about the inappropriate language used by female employees of UP. See brief for appellant at 18. It is not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134                                                                                          Page 19

13 Neb.App. 818, 703 N.W.2d 134

**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

entirely clear that Helvering's complaint was protected activity, although we will assume, without expressly so concluding, that it was. The district court did not grant summary judgment on the basis of Helvering's **834 activity's not being protected, and our resolution of other issues with respect to the retaliation claim makes an express determination on this element unnecessary.

[14] An individual who has opposed discriminatory employment practices is protected under § 48–1114(1). *Rose v. Vickers Petroleum, supra.* Helvering has not asserted that UP was engaging in any discriminatory employment practices and has not asserted that he voiced any opposition to a discriminatory employment practice when he sent the e-mail discussing the use of inappropriate language by female employees. As such, it does not appear that Helvering is asserting a protected activity under § 48–1114(1), and Helvering does not even reference § 48–1114(1) in either his petition or his brief on appeal.

Section 48–1114(2), although not referenced by Helvering in either his petition or his brief on appeal, prohibits discrimination against an employee who "has made a charge" under FEPA. Section 48–1104(1) makes it unlawful for an employer to harass any individual because of sex, and § 48–1102(14) includes the creation of a hostile working environment as "[h]arass[ment] because of sex." As such, it is arguable that Helvering's assertion that he was fired for making a "complaint" about inappropriate language being used by female employees constitutes a charge that UP was allowing a hostile working environment. The difficulty in this position, however, is that Helvering's e-mail discussing the inappropriate language did not actually request UP to take any action, and Helvering's own testimony in a deposition indicated that the e-mail was not sent with the purpose of having UP take any action; rather, Helvering testified that the e-mail was sent to get his side of the story out and because of the timing of the female employees' comments.

[15][16] The evil addressed by § 48–1114(3) is the exploitation of the employer's power over the employee when used to coerce the employee to endorse, through participation or acquiescence, the unlawful acts of the employer. **150*Wolfe v. Becton Dickinson & Co.,* 266 Neb. 53, 662 N.W.2d 599 (2003). The text of § 48–1114(3) and reasonable policy dictate that an employee's opposition to any unlawful act of the employer, whether or not the employer pressures the employee to actively join in the illegal activity, is protected under § 48–1114(3). *Wolfe v. Becton* *835 *Dickinson & Co., supra.* Helvering specifically references § 48–1114(3) in both his petition and his brief on appeal. He has not, however, made any assertion or offered any evidence to indicate that UP in any way coerced him to endorse, through participation or acquiescence, any unlawful acts by UP.

We determine that it is unnecessary to explicitly determine whether Helvering has demonstrated that he engaged in a protected activity. Although the specific subsection of the statute referenced by Helvering in both his petition and his brief on appeal does not seem applicable, and although the applicability of the remaining subsections of § 48–1114 is questionable, we will assume for the purpose of discussion that Helvering's e-mail constituted a complaint that UP was allowing a hostile working environment by allowing female employees to use inappropriate language.

*(ii) Adverse Employment Decision*

[17] There is no dispute in this case that Helvering suffered an adverse employment decision. Helvering's employment with UP was terminated. As such, it is clear that Helvering sufficiently alleged and demonstrated this element of his prima facie case.

*(iii) Causal Connection*

[18] The final element of Helvering's prima facie

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134

13 Neb.App. 818, 703 N.W.2d 134

**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

case for retaliation is that Helvering was required to demonstrate that there was a causal link between the allegedly protected activity and the adverse employment decision. The district court specifically found that Helvering had "offered no evidence that [his e-mail complaint concerning inappropriate language by female employees] caused his termination. This is merely an unsupported allegation by him." The district court also found that UP had sufficient reason to terminate Helvering prior to the date of his e-mail, namely "[a]n investigation resulting in [Helvering's] being warned that he could be terminated if he met with a female employee outside the presence of other employees, which he admitted to, and the allegation by [Hampton] that he propositioned her." We disagree with the district court's implicit determination that there was no genuine issue of fact concerning UP's having a sufficient reason to terminate Helvering's employment prior to his e-mail.

*836 The record indicates, contrary to the district court's implicit conclusion, that there is a genuine issue of fact concerning whether Helvering was warned that his employment could be terminated if he met with a female employee outside the presence of other employees, whether Helvering actually "violated" any such prohibition, and whether Helvering propositioned Hampton as she alleged. Although Jacobson testified in a deposition that Helvering had been told that "he should not put himself in a position where he is alone with any female employees," Helvering testified in a deposition that he had told Payne, Jacobson, and Murray it was "impossible" for him never to be in meetings alone with a female and that they had told him to "try not to find [himself] in a compromising position." Additionally, the testimony was conflicting about what actually happened when Helvering met with Hampton, and the evidence indicated that the meeting was not in private but had occurred with other employees coming and going in the same vicinity. Finally, although Hampton **151 alleged that Helvering had propositioned her during the meeting, Helvering specifically denied the allegation.

As such, whether there was a sufficient basis to terminate Helvering's employment prior to the date when he sent the e-mail requires resolution of facts about which there is a genuine dispute.

More important, however, is the fact that Helvering presented evidence that the temporal proximity between his allegedly protected activity and the adverse employment action was very close. In *Smith v. Allen Health Systems, Inc.,* 302 F.3d 827 (8th Cir.2002), the Eighth Circuit Court of Appeals discussed the possibility that temporal proximity between protected activity and an adverse employment action can be sufficient to circumstantially demonstrate causality. The court noted that sometimes, "the timing of one incident of adverse employment action following protected activity suffice[s] to establish causal connection." *Id.* at 832. " 'The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.' " *Id.* at 833 (quoting *Clark County School Dist. v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam)).

*837 For example, in *Sprenger v. Federal Home Loan Bank of Des Moines,* 253 F.3d 1106, 1113 (8th Cir.2001), the court held that proximity of a "matter of weeks" between disclosure of a potentially disabling condition and adverse employment action was sufficient to complete a prima facie case of discrimination. Similarly, in *Smith v. Allen Health Systems, Inc., supra,* the court concluded that proximity of approximately 2 weeks between the beginning of family leave and adverse employment action was sufficient, if barely so, to establish causation and complete a prima facie case of discrimination.

In the present case, Helvering sent his e-mail, which event we have above assumed for discussion to constitute protected activity, on May 28, 2000, and his employment was terminated on June 16, a proximity

of fewer than 3 weeks. Under the precedent established by the Eighth Circuit, we conclude that this temporal proximity alone is sufficient evidence to circumstantially establish the causal connection needed to complete Helvering's prima facie case. The district court recognized as much by noting that "[s]tanding alone, the fact that [Helvering] was terminated two weeks after submitting a complaint may circumstantially establish a causal connection between the protected activity and the subsequent adverse employment action." Notwithstanding the district court's contrary statement that Helvering's allegation of a causal connection was "unsupported," the district court appeared to recognize that Helvering had demonstrated a sufficient causal connection by demonstrating the very close temporal proximity between the allegedly protected activity and the adverse employment action.

*(iv) Conclusion on Prima Facie Case*

We conclude that the district court improperly resolved genuine issues of fact concerning the causal connection between the allegedly protected activity and the adverse employment action. Nonetheless, it is apparent that the district court implicitly found that Helvering had satisfied his burden to demonstrate a prima facie case of discrimination, at least sufficiently so to survive summary judgment. For the purpose of our analysis, we agree with the district court's implicit conclusion that Helvering engaged in protected activity, suffered an adverse employment action, and **152 demonstrated a causal connection between the two, at *838 least circumstantially based on the temporal proximity between the two.

(b) UP's Legitimate Nondiscriminatory Basis

[19] Because Helvering demonstrated a prima facie case of discrimination, it became UP's burden to demonstrate a legitimate nondiscriminatory basis for terminating Helvering's employment. See, *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Rose v. Vickers Petroleum,* 4 Neb.App. 585, 546 N.W.2d 827

(1996). UP asserted in its answer to Helvering's amended petition that Helvering's complaint should be "barred by his own conduct in creating a hostile work environment in direct violation of" §§ 48–1114 and 20–148. We agree with the district court's implicit conclusion that UP demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment, because the evidence indicates that Helvering's employment was terminated because of suspicion of sexual harassment.

Payne testified in a deposition that he made the decision to terminate Helvering's employment. Payne testified that the incidents he relied on "as creating a hostile environment by" the actions of Helvering were as follows:

I met with ... Helvering in early March [2000] and told him to be very careful, not put himself in a position, precarious position, with respect to others, Golden Rule. And I get a very serious charge in May from this dispatcher, [Helvering] is making sexual advances to her.

In my investigation, I started uncovering stories here and there of sexual behavior, so I decided to terminate him.

Payne also testified that Helvering used bad judgment in using the "basketball story," which referenced females, at the safety meeting. Payne testified that "[b]ased on [his] gathering of the facts as [he] could, [he] saw sexual harassment in the workplace, so [he] made a determination for termination." Payne acknowledged that he determined that terminating Helvering's employment was appropriate based on "Helvering's bad judgment in going outside the building ... with Hampton[,] based upon [Helvering's] use of the basketball story at the safety meeting, and ... based upon Hampton's request not to work with *839 Helvering and [the] statement that Helvering had put his hand on [another female employee's] knee."

703 N.W.2d 134                                                                                 Page 22
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

Jacobson testified in a deposition that the decision to terminate Helvering's employment was "a consensus decision" and that had it not been, he "would have forced it." Jacobson testified that Helvering's employment was terminated "[b]ecause he sexually harassed" Hampton. To support his conclusion that Helvering was guilty of sexual harassment, Jacobson pointed to Helvering's alleged attempts to take a road trip with Hampton, Helvering's telling of an offcolor story at the safety meeting, Helvering's meeting with Hampton, and Hampton's trying to get away from Helvering. Jacobson testified that he believed Hampton. According to Jacobson, Helvering was "trying to use his position to get sexual favors with ... Hampton."

Based on the evidence presented, it is apparent that UP sufficiently demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment. Although the district court did not specifically discuss UP's legitimate nondiscriminatory basis, the court did conclude that Helvering failed to meet his burden to demonstrate that UP's "reason" for terminating Helvering's employment was pretextual, implicitly finding that UP had demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment.**153** Based on the evidence presented, we agree that UP satisfied its burden in this regard.

(c) Helvering's Demonstration of Pretext

[20] Because UP demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment, it became Helvering's burden to demonstrate that the proffered basis was merely pretextual. See, *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Rose v. Vickers Petroleum,* 4 Neb.App. 585, 546 N.W.2d 827 (1996). We agree with the district court that Helvering failed to satisfy this burden, because he presented no evidence, other than the temporal proximity between the allegedly protected activity and the adverse employment action, to suggest that the real reason UP terminated his employment was discriminatory and not legitimate.

We have noted that the U.S. Supreme Court in **\*840** *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), heightened the employee's burden in discrimination cases. It is now incumbent upon an employee to prove not only falsity of the proffered reasons given by the employer, but also that discriminatory motive was the true reason for the discharge. See *id.* See, also, *Ventura v. State,* 246 Neb. 116, 517 N.W.2d 368 (1994). The trier of fact may rely on inferences rather than direct evidence of intentional acts, but intent must be proven by a preponderance of the evidence, whether direct, circumstantial, or otherwise. See, *Texas Dept. of Community Affairs v. Burdine, supra; Board of Trustees v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Rose v. Vickers Petroleum, supra.*

[21] Further, in *Smith v. Allen Health Systems, Inc.,* 302 F.3d 827 (8th Cir.2002), the court specifically held that although temporal proximity may be sufficient to demonstrate a prima facie case of discrimination, temporal proximity alone is not sufficient to satisfy the burden to show pretext. The court held that although strong evidence of a prima facie case can also be considered to establish pretext, proof of pretext or actual discrimination requires more substantial evidence. As such, although the plaintiff may attempt to establish intentional discrimination by showing that the employer's proffered explanation is unworthy of credence and the trier of fact may consider the evidence establishing the prima facie case, see *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), where temporal proximity is the only evidence establishing causality, such temporal proximity alone is usually insufficient to establish pretext. See *E.E.O.C. v. Kohler Co.,* 335 F.3d 766 (8th Cir.2003).

In the present case, as we noted above, Helvering demonstrated the very close temporal proximity be-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134                                                                                                    Page 23
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

tween his allegedly protected activity and the termination of his employment. Other than this temporal proximity, however, there is no evidence in the record indicating that UP was actually motivated by a desire to retaliate or discriminate against Helvering rather than by a conclusion that Helvering was guilty of sexual harassment. Helvering failed to satisfy the heightened burden of proof required to demonstrate pretext or intentional discrimination.

**\*841** (d) Conclusion on Retaliation

Although we conclude that Helvering arguably demonstrated a prima facie case of discrimination, we conclude that UP demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment and that Helvering failed to demonstrate that UP's proffered basis **\*\*154** was pretextual. Helvering demonstrated a prima facie case of discrimination by showing that he had engaged in an arguably protected activity, namely submitting an e-mail about inappropriate language being used by female employees; by showing that he suffered an adverse employment action when his employment was terminated; and by circumstantially demonstrating a causal connection between his activity and the adverse action by virtue of the very close temporal proximity between those two events. UP, however, demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment by showing that Helvering's employment was terminated because UP believed that he was guilty of sexual harassment. Helvering failed to adduce sufficient evidence to satisfy his burden to demonstrate that UP's proffered basis was merely pretextual, and UP was therefore entitled to judgment as a matter of law on Helvering's retaliation claim. As such, we find no merit to Helvering's assertions on appeal that the district court erred in granting UP summary judgment on the retaliation claim.

### 3. GENDER DISCRIMINATION CLAIM

Helvering next asserts that the district court erred in granting UP summary judgment on Helvering's claim that UP's termination of his employment was unlawful gender discrimination. Because we conclude that Helvering failed to satisfy his burden of adducing sufficient evidence to demonstrate that he was treated differently from similarly situated persons of the opposite sex, and because we conclude that UP demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment and Helvering failed to satisfy his burden of demonstrating that the proffered basis was merely pretextual, we conclude that the district court correctly granted UP summary judgment on the gender discrimination claim.

**\*842** (a) Helvering's Prima Facie Case

[22][23][24] It was Helvering's burden to first demonstrate a prima facie case of gender discrimination. See *Father Flanagan's Boys' Home v. Agnew,* 256 Neb. 394, 590 N.W.2d 688 (1999). See, also, *Riggs v. County of Banner,* 159 F.Supp.2d 1158 (D.Neb.2001). We conclude that Helvering failed to demonstrate that UP discriminated against Helvering, a member of the "majority" class of male employees, and conclude that Helvering failed to demonstrate that any similarly situated female employees were treated differently. A prima facie case of gender discrimination requires the plaintiff to prove that he or she (1) is a member of a protected class, (2) was qualified to perform the job, (3) suffered an adverse employment action, and (4) was treated differently from similarly situated persons of the opposite sex. *Riggs v. County of Banner, supra.*

### (i) Protected Class

[25][26] On the record presented at the summary judgment hearing, Helvering failed to satisfy the first element of a prima facie case because he failed to demonstrate that he was a member of a protected class or that UP discriminated against male employees. In reverse discrimination cases, the first element of the prima facie case is modified to require proof " 'that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.' " *Riggs v. County of Banner,* 159 F.Supp.2d at 1165 (quoting *Duffy v.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

Page 24

*Wolle,* 123 F.3d 1026 (8th Cir.1997), *cert. denied* 523 U.S. 1137, 118 S.Ct. 1839, 140 L.Ed.2d 1090 (1998)). See, also, *Notari v. Denver Water Dept.,* 971 F.2d 585 (10th Cir.1992).

In the present case, Helvering adduced no evidence to suggest that UP is that **155 "unusual employer who discriminates against the majority." See *Riggs v. County of Banner, supra.* There is no evidence in the record to suggest any background circumstances supporting a suspicion that UP tends to discriminate against males. As such, it is apparent that Helvering failed to satisfy the first element of his prima facie case.

*(ii) Helvering's Qualifications*

The record does not contain any dispute about Helvering's qualifications to perform the job of corridor manager. Helvering *843 had been employed by UP since 1972, and the record does not indicate any suggestion of prior performance problems. Even if the allegations of sexual harassment could be somehow construed to call into question his qualifications to continue his employment, the record indicates that Helvering, at a minimum, presented sufficient evidence to generate a genuine factual issue about his qualifications when he testified in a deposition that he had denied the allegations against him. As such, this element was arguably satisfied.

*(iii) Adverse Employment Action*

[27] Once again, there is no dispute that Helvering suffered an adverse employment action when his employment was terminated. As such, this element does not appear to be disputed and this element was satisfied.

*(iv) Disparate Treatment*

[28] The district court specifically found that Helvering had failed to adduce sufficient evidence to support a finding that he was treated differently from similarly situated female employees of UP. We agree

with the district court's conclusion that Helvering failed to demonstrate that he was treated differently from similarly situated female employees because Helvering failed to establish that the female employees who were the subject of his e-mail were similarly situated to him.

[29][30][31] The test to determine whether employees are similarly situated to warrant a comparison to a plaintiff is a rigorous one. *E.E.O.C. v. Kohler Co.,* 335 F.3d 766 (8th Cir.2003). Specifically, the individuals used for comparison must have dealt with the same supervisor, been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances. *Id.* For discriminatory discipline claims, employees are considered similarly situated when they are involved in or accused of the same offense and are disciplined in different ways. *Id.* The plaintiff has the burden of demonstrating that there were individuals similarly situated in all relevant aspects to her by a preponderance of the evidence. *Id.*

In the present case, Helvering failed to satisfy this burden. Helvering's assertion is that the female employees who used *844 inappropriate language and who were referenced in his e-mail were similarly situated to him. However, Helvering failed to demonstrate that those employees had the same supervisor or were subject to the same standards. In fact, Helvering's own testimony in a deposition indicated that at least some of the female employees had different positions from his at UP. Of even more importance, however, is that Helvering failed to demonstrate that the alleged misconduct was the same. Helvering was accused of sexual harassment and was alleged, inter alia, to have told a sexually harassing story at a safety meeting and to have propositioned a female employee. Helvering alleged in his e-mail that the female employees had used inappropriate language. Helvering has failed to demonstrate how these allegations involve the same conduct.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*\*156** Additionally, as the district court found, the record indicates that Helvering and the female employees were not similarly situated, because Helvering had previously been accused of sexual harassment and had previously been investigated for sexual harassment, whereas the record does not indicate any prior complaints or investigations concerning the female employees. Indeed, the record indicates that when Helvering was first accused of sexual harassment, he was spoken to by UP and was counseled to comply with UP's policies and not to put himself into a difficult position; when Helvering sent his e-mail concerning the female employees, they were spoken to by UP and were counseled to comply with UP's policies. It is arguable whether Helvering and the female employees were even treated differently, inasmuch as Helvering was terminated only upon the second accusation and investigation of sexual harassment. As such, Helvering failed to demonstrate that he was treated differently from similarly situated female employees.

(b) Conclusion on Gender Discrimination

Helvering failed to demonstrate a prima facie case of gender discrimination. Helvering failed to demonstrate that he is in a protected class or that UP discriminates against male employees, and he failed to demonstrate that he was treated differently from similarly situated female employees; he failed to demonstrate both that the female employees were treated differently and that they were similarly situated to him. As such, we find no merit to **\*845** Helvering's assertions concerning his gender discrimination claim. UP was entitled to a judgment as a matter of law, and the district court did not err in granting UP summary judgment on Helvering's gender discrimination claim.

4. AGE DISCRIMINATION CLAIM

Helvering next asserts that the district court erred in granting UP summary judgment on his claim that UP's termination of his employment was unlawful age discrimination. We conclude that even if Helvering demonstrated a prima facie case of age discrimination,

Helvering failed to adduce sufficient evidence to demonstrate that the legitimate nondiscriminatory reason proffered by UP for terminating his employment was pretextual. As such, we conclude that the district court did not err in granting UP summary judgment on Helvering's age discrimination claim.

(a) Helvering's Prima Facie Case

[32][33] It was Helvering's burden to first demonstrate a prima facie case of age discrimination. See, *Billingsley v. BFM Liquor Mgmt.,* 264 Neb. 56, 645 N.W.2d 791 (2002); *Allen v. AT & T Technologies,* 228 Neb. 503, 423 N.W.2d 424 (1988); *Apland v. Northeast Community College,* 8 Neb.App. 621, 599 N.W.2d 233 (1999). We conclude that the record does not establish sufficient evidence for us to find that Helvering demonstrated a prima facie case. To establish a prima facie case of age discrimination, the plaintiff must establish that (1) he or she was in the protected group, (2) he or she was subjected to an adverse employment action, (3) he or she was qualified for the employment position or benefit adversely denied, and (4) other similarly situated persons not in the protected group were treated differently. See *id.* We conclude that Helvering failed to satisfy his burden with respect to the last element, disparate treatment.

(i) Protected Group

[34] There is no dispute in this case that Helvering was within the relevant protected age group. Nebraska's Act Prohibiting Unjust Discrimination in Employment Because of Age, **\*\*157** Neb.Rev.Stat. § 48– 1001 et seq. (Reissue 2004), makes it unlawful to discriminate against a person who is at least 40 but fewer than 70 years of age, unless such age distinction is made for legitimate **\*846** and reasonable purposes. See *Apland v. Northeast Community College, supra.* Helvering alleged in his amended petition that he was approximately 48 years of age at the time his employment was terminated, and UP admitted this allegation in the answer. As such, this element of Helvering's prima facie case was satisfied.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134

Page 26

13 Neb.App. 818, 703 N.W.2d 134

**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**

*(ii) Adverse Employment Action*

[35] There is also no dispute that Helvering suffered an adverse employment action when his employment with UP was terminated. As such, this element of Helvering's prima facie case was also satisfied.

*(iii) Helvering's Qualifications*

As we previously mentioned, the record does not contain any dispute about Helvering's qualifications to perform the job of corridor manager. Helvering had been employed by UP since 1972, and the record does not indicate any suggestion of prior performance problems. Even if the allegations of sexual harassment could be somehow construed to call into question his qualifications to continue his employment, the record indicates that Helvering, at a minimum, presented sufficient evidence to generate a genuine factual issue about his qualifications when he testified in a deposition that he had denied the allegations against him. As such, this element was arguably satisfied.

*(iv) Disparate Treatment*

[36] Helvering alleged in his amended petition that the female employees who were the subject of his e-mail were "30 to 40" years of age and that they were treated differently from Helvering because they were not terminated. Our review of the record does not indicate that any evidence was adduced concerning the ages of any of the female employees, and we note that Helvering's brief on appeal cites only to his allegation in the transcript in support of his argument that the female employees "were younger." Brief for appellant at 38. In addition, as discussed in some detail above, Helvering failed to adduce sufficient evidence to show, in demonstration of disparate treatment, that the female employees were similarly situated to Helvering. Finally, the record does not demonstrate that Helvering was replaced by an employee outside of the protected group.

**\*847** As such, it is apparent that Helvering failed to adduce sufficient evidence to demonstrate this element, and Helvering thus failed to demonstrate a prima facie case of age discrimination. UP was therefore entitled to a judgment as a matter of law, and the district court did not err in granting UP summary judgment on the age discrimination claim.

(b) UP's Legitimate Nondiscriminatory Basis

[37] Assuming that Helvering could be found to have demonstrated a prima facie case of age discrimination, the burden would shift to UP to demonstrate a legitimate nondiscriminatory basis for terminating Helvering's employment. See, *Billingsley v. BFM Liquor Mgmt.,* 264 Neb. 56, 645 N.W.2d 791 (2002); *Allen v. AT & T Technologies,* 228 Neb. 503, 423 N.W.2d 424 (1988); *Apland v. Northeast Community College,* 8 Neb.App. 621, 599 N.W.2d 233 (1999). In this case, as discussed in more detail above, UP demonstrated that Helvering's employment was terminated because UP believed that Helvering was guilty of sexually harassing a female employee. As such, and for the reasons discussed in more detail above, we conclude that UP would have satisfied its burden to demonstrate a legitimate nondiscriminatory**\*158** basis for terminating Helvering's employment even if Helvering could be found to have demonstrated a prima facie case of age discrimination.

(c) Helvering's Demonstration of Pretext

[38] Because UP demonstrated a legitimate nondiscriminatory basis for terminating Helvering's employment, the burden would have shifted back to him to demonstrate that the proffered basis was merely pretext. See, *Billingsley v. BFM Liquor Mgmt., supra; Allen v. AT & T Technologies, supra; Apland v. Northeast Community College, supra.* Even if Helvering could be found to have satisfied his burden to demonstrate a prima facie case of age discrimination, we agree with the district court that Helvering failed to demonstrate that UP's proffered basis for terminating his employment was merely pretextual. Helvering presented no evidence to suggest that the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

real reason UP terminated his employment was discriminatory and not legitimate.

As noted above, the U.S. Supreme Court in **848** *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), heightened the employee's burden in discrimination cases, and it is now incumbent upon an employee to prove not only falsity of the proffered reasons given by the employer, but also that discriminatory motive was the true reason for the discharge. See, also, *Ventura v. State,* 246 Neb. 116, 517 N.W.2d 368 (1994). The trier of fact may rely on inferences rather than direct evidence of intentional acts, but intent must be proven by a preponderance of the evidence, whether direct, circumstantial, or otherwise. See, *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Board of Trustees v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Rose v. Vickers Petroleum,* 4 Neb.App. 585, 546 N.W.2d 827 (1996).

In the present case, Helvering testified in a deposition that Murray had once said to Helvering that Helvering was "a middle-aged white male [and was] very vulnerable." It is not clear from the record when Murray allegedly made this comment. Additionally, Helvering testified that UP had "a history of terminating people that are nearing retirement to save the officers' pension." Helvering was questioned about former employees whose employment he was alleging had been terminated when they neared retirement, and he identified two former employees. Helvering acknowledged that one had had a disability and received disability benefits at the time his employment was terminated, but he acknowledged that he did not know whether the other had lost any benefits which had vested prior to the termination of his employment.

We conclude that the meager evidence presented by Helvering was insufficient as a matter of law to meet the heightened burden to demonstrate pretext. The evidence is insufficient to demonstrate that UP's

proffered reason for terminating Helvering's employment, because of a belief that he had sexually harassed a female employee, was false and that the true motive for terminating his employment was discrimination. As such, we conclude that Helvering failed to satisfy his burden of proof and that UP was entitled to a judgment as a matter of law. The district court did not err in granting UP summary judgment on Helvering's age discrimination claim.

**849** (d) Conclusion on Age Discrimination

Helvering failed to demonstrate a prima facie case of age discrimination because he failed to demonstrate disparate treatment. Helvering failed to adduce sufficient evidence to show that similarly situated employees**159** not in the protected age group were treated differently from him; he failed to demonstrate both that the female employees were similarly situated to him and that they were not in the protected age group. In addition, even if Helvering could be found to have demonstrated a prima facie case, UP demonstrated a legitimate nondiscriminatory basis for terminating his employment upon a belief that he had sexually harassed a female employee, and Helvering failed to adduce sufficient evidence to demonstrate that UP's proffered reason was merely pretextual. As such, we find no merit to Helvering's assertions concerning his age discrimination claim. UP was entitled to a judgment as a matter of law, and we conclude that the district court did not err in granting UP summary judgment on the age discrimination claim.

V. CONCLUSION

The district court did not err in granting UP summary judgment on Helvering's retaliation claim, Helvering's gender discrimination claim, and Helvering's age discrimination claim. Helvering failed to satisfy his burden of proof with respect to each of the claims, and UP was entitled to a judgment as a matter of law on each. The order of the district court granting UP summary judgment on each of the claims is affirmed.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

703 N.W.2d 134                                                          Page 28
13 Neb.App. 818, 703 N.W.2d 134
**(Cite as: 13 Neb.App. 818, 703 N.W.2d 134)**


    AFFIRMED.


Neb.App.,2005.
Helvering v. Union Pacific R. Co.
13 Neb.App. 818, 703 N.W.2d 134

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Nebraska EMPLOYMENT

*A monthly newsletter designed exclusively for Nebraska employers*

# Law Letter

**Mark M. Schorr, Editor**
**Jason R. Yungtum, Contributing Editor**

*Vol. 11, No. 1*
*November 2005*

## SEXUAL HARASSMENT

# Warning derails habitual harasser

*Progressive discipline has long been a useful tool for Nebraska employers. Interim warnings and corrective action plans provide employees with second chances and also give employers an added defense if a discharge leads to a discrimination claim. That's especially true when the earlier warning provides that further unacceptable conduct of the type generating the warning will result in discharge. A recent Nebraska Court of Appeals decision in an Omaha case helps to illustrate those points.*

## Facts

Robert Helvering began working for the Union Pacific Railroad in 1972. In 1990, he was transferred to the company's headquarters in Omaha and promoted from dispatcher to corridor manager, becoming the direct supervisor of all train dispatchers in his area.

Before 2000, there were no complaints or disciplinary actions involving Helvering. Early that year, however, Union Pacific's management learned of multiple sexual harassment complaints against the corridor manager. Specifically, he was reportedly seen touching, fondling, and caressing females in the workplace. He also was accused of belittling and talking in a demeaning manner to female train dispatchers.

The allegations were investigated but were difficult to prove because a number of employees were unwilling to come forward and have their names used in connection with Helvering's discipline. The railroad's director of equal employment opportunity (EEO) and affirmative action, however, concluded that enough had been said to worry her about his behavior, given that he was in charge of supervising train dispatchers.

After the investigation, Helvering denied the allegations but was sternly counseled in March 2000 to make

sure that his behavior complied with the company's EEO policies and standards for workplace conduct. He also was clearly warned not to be involved in touching any employee in any way and not to attend any meetings when only he and a female train dispatcher were present. He agreed that he shouldn't put himself in a position to be alone with any female employee and acknowledged that he was informed that any further complaints of that type would result in his discharge.

## He just didn't get it

Shortly thereafter, however, Helvering found himself in trouble again. Christine Hampton was a train dispatcher who worked under his supervision. In February 2000, a manager of train dispatchers had warned her that

---

## What's Inside . . .

**Employee Illness**
As flu season approaches, beware the tolls
of absenteeism and presenteeism ........................... 3

**Ask Mark**
Once again, we look at the tricky process
of figuring overtime pay after a bonus ................... 5

**Agency Action**
National Guard and reserve members now
allowed to file USERRA claims online ................. 5

**Employment Interviews**
Hire education: a handy primer on what
questions you can and can't ask ............................ 6

**HR Trends**
Businesses step up to the plate and make
large donations after hurricanes ............................ 7

**www.HRhero.com**

---



EXHIBIT B

Helvering "would probably make a pass at her" and would retaliate against her if she rejected him. The manager also told her that other females had been approached and "touched" by Helvering, including one incident in which he allegedly "put his hand on a woman's breast" while posing for a photograph.

Around or shortly after the March meeting during which Helvering was warned and counseled about his behavior, Hampton attended a safety meeting with him during which he told a story that he prefaced by saying she "would like" it. In the story, he recounted being a referee at a sporting event and seeing a female in the stands wearing a short skirt with no undergarments. He claimed that her legs were spread apart and that he therefore couldn't take his attention away from her to perform his duties as a referee.

Helvering later acknowledged telling the story but claimed that it was about a woman in the stands merely wearing a short skirt. He also denied claiming that the story was for Hampton's benefit. He justified telling the story by saying it illustrated the importance of having his employees stay focused on their work by simply keeping their mind on what they were doing.

Shortly thereafter, Hampton claimed that Helvering wanted her to "go on a road trip" to see the territory where she would be dispatching trains. Others apparently informed her that he was telling corridor managers and directors that she wanted him to go on the trip with her, although she emphatically denied that that was the case. In the end, they didn't go on the trip together.

---

**W**eb **A**lert

## The jury giveth, and the court taketh away

Our website, HRhero.com, gives you the latest national news in employment law. To read the following articles, go to www.HRhero.com/news.

- **"Court throws out $3 million jury verdict"** — An employee lost the large jury verdict in his disability discrimination case because the appeals court decided he wasn't treated differently than employees who weren't disabled.

- **"Releases prevent lawsuits . . . or do they?"** — Confusing language in a company's release agreement prevents the agreement from covering an employee's age discrimination suit.

- **"Employee's firing based on faulty criminal history not discriminatory"** — A federal appellate court finds that an employee failed to prove that his employer's reliance on criminal history reports had a disparate impact on minorities. ❖

In late May 2000, as Hampton was leaving work for the day, Helvering asked if she had "a few minutes to talk." She declined, but he persisted and asked her to go "on the patio" to talk. When they got outside the building, he asked, "[W]hat do you think of me?" She responded by commenting on his capabilities as a "trainman," but he persisted in telling her that he wanted her impression of him and "wanted something personal." She again commented only on his capabilities as a trainman.

Helvering then attempted to continue the conversation by telling Hampton about another female employee who had filed an "EEO complaint against him which could not be proven." And without taking another breath, he stated: "Any red-blooded male would want to touch, I would want to touch you, would you consider meeting me outside of work?" He repeated the comment again and requested that they "meet outside of work." She replied, "Absolutely not," and walked off.

Hampton immediately asked to be moved out of the region in which Helvering was the corridor manager. Union Pacific management then interviewed her about the recent incidents that caused her to request the transfer.

As a result of those developments, which necessitated a new investigation, the managers met with Helvering again. They asked him why he had met with Hampton alone when they had previously warned him not to place himself in that type of situation. When he acknowledged having met with Hampton, the railroad suspended him with pay pending further investigation. Another female employee came forward and alleged that he had "placed his hand on her bare knee" while at work, although she didn't want to formalize the complaint.

During the second investigation, Helvering sent an e-mail to company management claiming that within the past two weeks, two female employees had made sexually inappropriate comments in his presence. He said the comments were offensive and humiliating to him but didn't interfere with his ability to do his job. Those allegations were added to the investigation, and the two female employees mentioned in the complaint — neither of whom had any history of discipline or workplace problems — were disciplined and provided with a review of the company's EEO policies and standards for language and conduct.

### Helvering's derailment

In mid-June 2000, after the second investigation ended, Helvering was fired because of his conduct after the March meeting and warning. Just days and weeks after receiving a warning and agreeing that he wouldn't place himself in such positions, he reportedly told an inappropriate story in a safety meeting, placed his hand on a female employee's knee, and made sexual advances toward Hampton, causing her to immediately demand a transfer out of his region. As a result, the managers' consensus decision was to fire him in accordance with the previous warning.

## Discrimination complaint

After the firing, Helvering filed a wrongful discharge claim against Union Pacific. He argued that the railroad had retaliated against him for filing his own complaint against the two female employees for their use of inappropriate language and claimed that he was also a victim of unlawful sex and age discrimination. He believed that he was a victim of sex discrimination because he was fired while the two females about whom he complained were simply disciplined. His age claim was apparently tied to his allegation that during the second investigation into the harassment complaints against him, a company manager made an isolated comment that Helvering was "a middle-aged white male" who was "very vulnerable."

In any event, the district court in Omaha promptly disposed of Helvering's claims on "summary judgment" (*i.e.*, without finding the need to have a trial). The court found no connection between his firing and his complaint about the female employees' language, which arose while he was under investigation for sexual harassment for the second time in just a few months. The railroad had shown legitimate reasons for firing him, *i.e.*, his continuing unacceptable conduct after first being properly warned and cautioned not to be alone with female employees. As a result, he couldn't show that the reasons given for his dismissal were pretextual.

Since Helvering had been warned not to be alone with female employees and had violated that order, he and the female employees about whom he had complained weren't similarly situated, thereby precluding his ability to pursue his gender discrimination complaint. Those reasons also precluded his age claim. He appealed those findings to the court of appeals.

## End of the rail line

Helvering found no more success in the court of appeals in Lincoln than he had found in the district court in Omaha. Even though he was fired right after making the allegations about the two female employees, the weight of the evidence established that he was indeed let go because Union Pacific believed he was guilty of sexual harassment — in violation of its policy and the earlier stern warnings that he would be fired if he engaged in further similar conduct.

The court quickly disposed of Helvering's sex discrimination claims, finding that he had failed to show that (1) he was actually in a protected class, (2) Union Pacific discriminates against male employees, or (3) he was treated differently than any similarly situated female employees. The court likewise rejected his age claim because he couldn't even make out a *prima facie* (or minimally sufficient) case by showing that he was treated differently than any similarly situated employee not in the protected age group.

In the end, the court repeatedly emphasized that Union Pacific had demonstrated a reasonable belief that Helvering had sexually harassed female employees and violated the understandings and warning issued to him during the March 2000 meeting. Therefore, the trial court properly rejected all of his claims without the need for a trial. *Helvering v. Union Pacific Railroad Co.*, 13 Neb. App. 818 (2005).

## Bottom line

This case presents an excellent example of how the appropriate use of progressive discipline and previous warnings will help you down the road. After Union Pacific's investigation into alleged sexual harassment, for which the evidence was substantial but not overwhelming, the alleged perpetrator was sternly counseled and warned. Specifically, he was cautioned against allowing himself to be placed in a position of being alone with a female subordinate. When he went right out within the next few days and weeks and continued to engage in similar conduct, he was indeed fired.

> **The appropriate use of progressive discipline will help you down the road.**

*Find out more about sexual harassment in the subscribers' area of HRhero.com, the website for Nebraska Employment Law Letter. You have access to an HR Executive Special Report on the subject: "Workplace Harassment Trail Guide: Avoiding the Avalanche Zone." Just log in and scroll down to the link for all the Special Report titles. Lost your password? Call customer service at (800) 274-6774.* ❖

## ABSENTEEISM

# Keeping employees healthy helps keep the bottom line healthy

*As the annual flu season begins, you may have to face the challenges of absenteeism, presenteeism, and how both can affect your company's bottom line. A 2004 survey by the Harvard Business Review reported that companies may lose as much as $150 billion a year because of workers coming to work sick. On one hand, when employees are absent from work, it creates more work for your other employees and reduces productivity. On the other hand, sick employees are going to be less productive when they're at work and are likely to infect your healthy employees, which will be an even greater drain on productivity. While there's no perfect answer, you have some options to consider when dealing with the problem.*

## Cough, cough, hack, hack

For years, many companies have looked for ways to encourage their employees to take fewer sick days.

## IN THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA

| | | |
|---|---|---|
| CHARLEEN A. PEARCE, an Individual, | ) | Case No: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **PRAECIPE FOR SUMMONS** |
| | ) | |
| WERNER ENTERPRISES, INC., a | ) | |
| Nebraska Corporation, and DRIVERS | ) | |
| MANAGEMENT, LLC, a Delaware | ) | |
| Limited Liability Company, | ) | |
| | ) | |
| Defendants. | ) | |

Please issue summons in the above-captioned matter for personal service with the

Complaint by the Sheriff of Sarpy County upon the registered agent for defendant

Werner Enterprises, Inc. at the following address:

>        Robert E. Synowicki
>        Registered Agent
>        Werner Enterprises, Inc.
>        14507 Frontier Road
>        Omaha, NE 68138

Plaintiff's counsel will deliver the summons to the Sheriff of Sarpy County for

service.

>        CHARLEEN A. PEARCE
>
>        By: _____
>        One of Plaintiff's Attorneys

Ronald Brown, #15354
Brown & Theis, LLP
11640 Arbor Street, Suite 203
Omaha, NE 68144
Tel: (402) 932-7555
Fax: (402) 932-7556
ron@browntheis.com

Michael J. Merrick, #19855
Merrick Law Firm LLC
3801 Harney Street, Suite 100
Omaha, NE 68131
Tel: (402) 933-4256
Fax: (312) 269-0800
merrick@merricklawfirm.com

**IN THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA**

| | | |
|---|---|---|
| CHARLEEN A. PEARCE, an Individual, | ) | Case No: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **PRAECIPE FOR SUMMONS** |
| | ) | |
| WERNER ENTERPRISES, INC., a | ) | |
| Nebraska Corporation, and DRIVERS | ) | |
| MANAGEMENT, LLC, a Delaware | ) | |
| Limited Liability Company, | ) | |
| | ) | |
| Defendants. | ) | |

Please issue summons in the above-captioned matter for personal service with the

Complaint by the Sheriff of Sarpy County upon the registered agent for defendant

Drivers Management, LLC at the following address:

> Robert E. Synowicki
> Registered Agent
> Drivers Management, LLC
> 14507 Frontier Road
> Omaha, NE 68138

Plaintiff's counsel will deliver the summons to the Sheriff of Sarpy County for

service.

CHARLEEN A. PEARCE

By: _____

One of Plaintiff's Attorneys

| | |
|---|---|
| Ronald Brown, #15354 | Michael J. Merrick, #19855 |
| Brown & Theis, LLP | Merrick Law Firm LLC |
| 11640 Arbor Street, Suite 203 | 3801 Harney Street, Suite 100 |
| Omaha, NE 68144 | Omaha, NE 68131 |
| Tel: (402) 932-7555 | Tel: (402) 933-4256 |
| Fax: (402) 932-7556 | Fax: (312) 269-0800 |
| ron@browntheis.com | merrick@merricklawfirm.com |

| Image ID:<br>D00278600D01 | **SUMMONS** | Doc. No.    278600 |
|---|---|---|

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam
Omaha                    NE 68183


Charleen A Pearce v. Werner Enterprises Inc

                                        Case ID: CI 14     6889


TO:  Werner Enterprises Inc

                                        **FILED BY**

                                Clerk of the Douglas District Court
                                        08/25/2014

You have been sued by the following plaintiff(s):

     Charleen A Pearce




Plaintiff's Attorney:    Michael J Merrick
Address:                 3801 Harney Street #100
                         Omaha, NE 68131

Telephone:               (402) 933-4256

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.


Date: AUGUST 25, 2014      BY THE COURT:    _John M. Friend_
                                                Clerk

PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

          Werner Enterprises Inc
          c/o Robert E Synowicki, RA
          14507 Frontier Road
          Omaha, NE 68138

BY:  Sarpy County Sheriff
Method of service:  Personal Service

You are directed to make such service within twenty days after date of issue,
and show proof of service as provided by law.

| Image ID:<br>D00278601D01 | **SUMMONS** | Doc. No.    278601 |

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam
Omaha                    NE 68183


Charleen A Pearce v. Werner Enterprises Inc

Case ID: CI 14     6889


TO:  Drivers Management LLC

**FILED BY**

Clerk of the Douglas District Court
08/25/2014

You have been sued by the following plaintiff(s):

    Charleen A Pearce




Plaintiff's Attorney:    Michael J Merrick
Address:                 3801 Harney Street #100
                         Omaha, NE 68131

Telephone:               (402) 933-4256

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.


Date: AUGUST 25, 2014      BY THE COURT:   *John M. Friend*
                                               Clerk

PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

        Drivers Management LLC
        c/o Robert E Synowicki, RA
        14507 Frontier Road
        Omaha, NE 68138

BY:  Sarpy County Sheriff
Method of service:  Personal Service

You are directed to make such service within twenty days after date of issue,
and show proof of service as provided by law.

Case Number: D01CI140
PAGE action: 000158
Filing Date: 08/27/2014 10:00:

DOC:   **CI14**

**PEARCE,CHARLEEN A**

v

**WERNER**

Serve:   WERNER,                                              Doc Number:   **278600**

Date Received:   8/26/2014   at   08:24 o'clock AM

# R E T U R N   O F   S E R V I C E

I hereby certify that I have received this/these document(s):

SUMMONS,COMPLAINT

SERVICE OF BUSINESS:   By delivering a copy of said document(s) to the following
business by personally delivering to the person listed below:

WERNER                                8/26/2014   at   13:15 o'clock PM

at   14507 FRONTIER RD

leaving with   SANDY STANCZYK

Remarks:   ROBERT SYNOWICKI OUT OF TOWN. L/W SANDY STANCZYK HIS
LEGAL SECRETARY

Service and Return:   $18.00        927:   $0.00     859:   $0.00     465:   $3.47

Total Fee:           $21.47     County:   $0.00   Other:   $0.00

JEFF DAVIS, SHERIFF OF SARPY COUNTY, NEBRASKA

by:                                                   Dated:   8/27/2014

                                                      Served by Badge #: 465

2014006371/s340

DOC:   **CI14**

Case Number: D01CI140
Transaction: 6889
PAGE: 000158
Filing Date: 08/27/2014 10:00:

**PEARCE,CHARLEEN A**

v

**WERNER**

Serve:   DRIVERS MANAGEMENT,                          Doc Number:   **278601**

Date Received:   8/26/2014   at   08:32 o'clock AM

## R E T U R N   O F   S E R V I C E

I hereby certify that I have received this/these document(s):

SUMMONS,COMPLAINT

SERVICE OF BUSINESS:   By delivering a copy of said document(s) to the following business by personally delivering to the person listed below:

DRIVERS MANAGEMENT                8/26/2014   at   13:15 o'clock PM

at   14507 FRONTIER RD

leaving with   SANDY STANCZYK

Remarks:   ROBERT SYNOWICKI IS OUT OF TOWN. L/W HIS LEGAL SECRETARY
SANDY STANCZYK

Service and Return:   $9.00        927:   $0.00     859:   $0.00     465:   $0.00

Total Fee:        $9.00     County:   $0.00   Other:   $0.00

JEFF DAVIS, SHERIFF OF SARPY COUNTY, NEBRASKA

by:                                        Dated:   8/27/2014

                                     Served by Badge #: 465

2014006373/s340