IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CHARLEEN A. PEARCE, an Individual,<br><br>Plaintiff,<br><br>vs.<br><br>WERNER ENTERPRISES, INC., a Nebraska Corporation, and DRIVERS MANAGEMENT, LLC, a Delaware Limited Liability Company,<br><br>Defendants. | 8:14-CV-290<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the motion to dismiss (filing 13) filed by defendant Werner Enterprises, Inc. For the reasons discussed below, the motion will be granted in part, with the remainder of the motion being denied.

I. FACTUAL BACKGROUND[1]

Werner is a Nebraska corporation with its principal place of business in Nebraska. Defendant Drivers Management, LLC is a Delaware LLC based in Nebraska. Drivers is wholly owned by another Delaware LLC which, in turn, is wholly owned by Werner—in other words, Werner is Drivers' "grandparent" corporation. Filing 1-1 at ¶¶ 4–5; filing 10. In January 2013, plaintiff Charleen A. Pearce, an Alabama resident, began her employment with Drivers as a student truck driver. This case arises from the sexual harassment, culminating in an assault and battery, that Pearce alleges she suffered at the hands of a Werner employee, Robert Helvering.[2]

Pearce alleges that Helvering has a history of sexually harassing female employees. Prior to being hired by Werner, Helvering was fired from

---

[1] For purposes of the pending motion, the Court accepts as true the facts alleged in Pearce's complaint. *See* Fed. R. Civ. P. 12(b)(6).

[2] To be clear: Pearce worked for Drivers and Helvering worked for Werner; notwithstanding their different employers, Helvering was essentially Pearce's supervisor. The precise relationship between Pearce and Werner (i.e., whether Werner was her employer) is contested.

his job at Union Pacific for multiple incidents of sexual harassment, including unwanted physical contact. Filing 1-1 at ¶¶ 6–17. Helvering disclosed this history of misconduct to Werner when it hired him.³ Filing 1-1 at ¶ 20.

Helvering continued his pattern of harassing behavior while employed at Werner. In 2008, Werner officials received an anonymous complaint that Helvering, who sometimes did his work as a dispatcher from his home, was "using his position to procure women while on the job." Filing 1-1 at ¶ 28. In 2011, Werner received complaints from two female drivers that they had been subjected to sexual harassment by Helvering. Filing 1-1 at ¶¶ 33–39.

Pearce alleges that from the outset of her employment with Drivers in 2013, she was subjected to sexual harassment and a hostile work environment. After being sexually harassed by her first driver-trainer, she was assigned a new driver-trainer, Mary Cunningham, who continued the harassment. Among other things, Pearce alleges that Cunningham frequently made sexually-explicit comments, suggested that they should have sex, and would, in Pearce's presence, engage in sexually explicit phone calls, send sexually explicit text messages and photographs to fellow drivers and trainers, and would dictate such messages to Pearce and require her to text them on her behalf. Filing 1-1 at ¶¶ 45–54.

Cunningham and Pearce were on Helvering's "drivers board," which meant that he was responsible for routing their truck. Filing 1-1 at ¶ 55. Pearce alleges that Cunningham flirted with Helvering, who texted a photo of himself to Cunningham and asked her and Pearce for photos of themselves. Pearce alleges that Helvering also made vulgar comments to her and Cunningham. Filing 1-1 at ¶¶ 57, 59.

On March 4, 2013, Cunningham and Pearce were passing through Omaha, Nebraska. Helvering met them at Werner's cafeteria for lunch and made plans to take them out to dinner that night. Helvering told Cunningham that he would meet her at her hotel room, which she shared with Pearce, to discuss giving Cunningham more miles (which would result in increased compensation). Filing 1-1 at ¶¶ 60–61.

Later that day, Pearce alleges, Helvering entered her hotel room with his pants partially unzipped, and closed the door and locked the deadbolt. Helvering began talking to Cunningham about giving her more miles, and after telling her he could give her 5,000 more miles a week, he approached

---

³ The details of Helvering's misconduct at Union Pacific were also made public in his wrongful termination suit against Union Pacific. In a published opinion, the Nebraska Court of Appeals affirmed the state district court's grant of summary judgment for Union Pacific. *See Helvering v. Union Pacific R. Co.*, 703 N.W.2d 134 (Neb. Ct. App. 2005). Pearce alleges that this suit, as well as an article about the suit in a Nebraska employment law newsletter, put Werner on further notice of Helvering's history of sexual harassment. *See* filing 1-1 at ¶¶ 18, 21, 25–27 & pp. 50–52.

- 2 -

Cunningham and began kissing and groping her. Pearce alleges that Cunningham twice attempted to extricate herself, but that he continued to kiss and grope her, and so Pearce "began making noise to distract Helvering." Filing 1-1 at ¶¶ 62–66. Pearce alleges that Helvering then approached her and forcefully grabbed one of her breasts, and that after she pushed him back, he began approaching her again. Cunningham yelled at Helvering to stop and told Pearce to get outside, which she did. Filing 1-1 at ¶¶ 69–72. Cunningham and Helvering emerged from the hotel room approximately 20 minutes later. Cunningham told her that they still had to go to dinner with Helvering. Helvering then approached Pearce and forcefully grabbed her arm and pulled her close, then told her in a threatening manner that all they did in the hotel room was kiss and hug. Pearce alleges that she suffered scratches and bruises from Helvering's attack. Later that night, Pearce reported the incident to police and defendants' officials. Helvering was arrested, and his employment with Werner was terminated. Filing 1-1 at ¶¶ 73–79.

Pearce alleges that after returning to work from medical leave on March 20, 2013, she was again harassed by her new trainer. In April 2013 she took medical leave to obtain psychiatric treatment. She subsequently filed charges of discrimination with the United States Equal Employment Opportunity Commission (EEOC). On May 13, the EEOC notified Drivers of Pearce's charges. On May 15, Drivers terminated Pearce's employment. Filing 1-1 at ¶¶ 80–85.

## II. STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. While the Court must accept as true all facts pleaded by the nonmoving party and grant all reasonable inferences from the pleadings in favor of the nonmoving party, *Gallagher v. City of Clayton,* 699 F.3d 1013, 1016 (8th Cir. 2012), a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. *Iqbal,* 556 U.S. at 678. Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* at 679.

III. ANALYSIS

Pearce asserts that Werner is vicariously liable for the alleged torts of its employee, Helvering, and brings Nebraska common law claims for battery, assault, and intentional infliction of emotional distress against Werner (counts I through III of Pearce's complaint). Pearce also asserts that Werner is directly liable for its own negligence in hiring, supervising, and retaining Helvering (count IV). And Pearce brings claims under various state and federal anti-discrimination statutes against Drivers, for sexual harassment, disability discrimination, and retaliation (counts V through XIV). Pearce's claims against Drivers are not before the Court at this time.

In its motion to dismiss, Werner contends that the Nebraska Workers' Compensation Act (the Act), Neb. Rev. Stat. § 48-101 *et seq.*, provides the exclusive remedy for all of Pearce's claims against Werner. So, Werner argues, Pearce's claims belong in front of the Nebraska Worker's Compensation Court, and must be dismissed for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). Alternatively, Werner moves to dismiss Pearce's claims for assault, battery, and intentional infliction of emotional distress for failure to state a claim. Werner contends that on the facts alleged, it cannot be held vicariously liable for the intentional torts of Helvering.

The Court finds Werner's first argument unpersuasive, but finds merit in its second argument. On the facts alleged, Werner cannot be held vicariously liable for Helvering's alleged intentional torts (counts I through III). However, Pearce's negligence claim against Werner (count IV) will proceed, as will her claims against Drivers for gender and disability discrimination and retaliation under state and federal law (counts V through XIV) .

### A. Worker's Compensation Act

The Act is an employee's exclusive remedy against an employer for an accidental injury arising out of and in the course of employment. *Estate of Teague by and through Martinosky v. Crossroads Coop. Assoc.*, 834 N.W.2d 236, 243 (Neb. 2013) . And the Nebraska Workers' Compensation Court has exclusive jurisdiction in actions arising under the Act. *See Abbott v. Gould, Inc.*, 443 N.W.2d 591, 593 (Neb. 1989).

In her complaint, Pearce alleges that Drivers, not Werner, was her employer. Werner maintains, however, that it should be considered Pearce's "joint" or "special" employer in conjunction with Drivers. *See*, *Daniels v. Pamida, Inc.*, 561 N.W.2d 568, 571–72 (Neb. 1997) (special); *White v. W. Commodities, Inc.*, 295 N.W.2d 704, 708–09 (Neb. 1980) (joint). In support, Werner has submitted certain evidentiary materials, including a declaration from one of its vice presidents describing the relationship between Werner

and Drivers, a copy of a "Service Agreement" between Werner and Drivers, and a job description for Helvering's position with Werner. *See* filing 14. Werner contends that because the Worker's Compensation Court has exclusive jurisdiction to hear claims arising under the Act, this Court lacks subject matter jurisdiction. Therefore, Werner argues, its challenge is properly brought under Fed. R. Civ. P. 12(b)(1), and thus the Court is permitted to consider evidentiary materials outside the pleadings.

Werner's argument is without merit. This Court has federal question jurisdiction over Pearce's federal claims against Drivers, and supplemental jurisdiction over her remaining state-law claims against Drivers and Werner. *See* 28 U.S.C. § 1367(a). Indeed, those were the grounds Werner cited in removing this case to this Court. *See* filing 1. It also appears that the requirements for diversity jurisdiction are satisfied. *See* 28 U.S.C. § 1332.

Even if Pearce's claims are ultimately determined to fall under the exclusive provisions of the Act, that will not affect this Court's subject matter jurisdiction. *See Cincinnati Indem. Co. v. A & K Const. Co.*, 542 F.3d 623, 624 (8th Cir. 2008). State law cannot be construed to enlarge or contract federal jurisdiction. *Beach v. Owens-Corning Fiberglas Corp.*, 728 F.2d 407, 409 (7th Cir. 1984). Werner's argument regarding the Act is therefore properly considered as a non-jurisdictional attack on the merits under Fed. R. Civ. P. 12(b)(6). *See Cincinnati Indem.*, 542 F.3d at 624. As such, the Court will not consider matters outside the pleadings. *See* Fed. R. Civ. P. 12(d). And the facts alleged in Pearce's complaint do not show that Werner was Pearce's special or joint employer.

### B. Vicarious Liability

Under the doctrine of *respondeat superior*, an employer may be held vicariously liable for the negligence or intentional torts of its employee, provided the employee was acting within the scope of the employer's business. *See, Reeder v. State*, 578 N.W.2d 435, 439 (Neb. 1998); *Strong v. K & K Invs., Inc.*, 343 N.W.2d 912, 914–16 (Neb. 1984). Pearce seeks to hold Werner vicariously liable for Helvering's intentional torts. To do so, Pearce must show that the relationship of master and servant (employer and employee) existed at the time of the injury and with respect to the particular transaction resulting in the alleged tort, and she must show that Helvering was acting within the scope of his employment. *Strong*, 343 N.W.2d at 915.

In determining whether conduct falls within an employee's scope of employment, the Nebraska Supreme Court has used the Restatement (Second) of Agency (1958) for guidance.[4] In *Johnson v. Evers*, 238 N.W.2d

---

[4] Hereinafter, "Rest. 2d Agency." Subsequent citations to the Restatement (Third) of Agency (2006) will be given as "Rest. 3d Agency."

474, 476 (Neb. 1976), the court turned to Rest. 2d Agency § 228, which provides, in part:

> (1) Conduct of a servant is within the scope of employment if, but only if:
> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits; [and]
> (c) it is actuated, at least in part, by a purpose to serve the master . . . .

Rest. 2d Agency § 228; *see also Strong*, 343 N.W.2d at 915–16.

The third factor—Helvering's purpose in committing the alleged acts—is dispositive in this case. Generally speaking, courts have held that acts of sexual assault or harassment, such as Helvering's alleged attack on Pearce, do not fall within the scope of the tortfeasor's employment. *See, e.g.*, *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 612–14 (7th Cir. 2008) (Indiana law); *Zuidema v. Raymond Christopher, Inc.*, 866 F. Supp. 2d 933, 937 (N.D. Ill. 2011) (collecting Illinois cases); *Doe v. Alsaud*, 12 F. Supp. 3d 674 (S.D.N.Y. 2014) (surveying New York decisions); *Montgomery Cnty. Bd. of Educ. v. Horace Mann Ins. Co.*, 860 A.2d 909, 919–20 (Md. 2004); *Petrell v. Shaw*, 902 N.E.2d 401, 407–08 (Mass. 2009); *Hamed v. Wayne Cnty.*, 803 N.W.2d 237, 244–45 (Mich. 2011); *Ocana v. Am. Furniture Co.*, 135 N.M. 539, 551–52 (N.M. 2004); *W. Va. Jail and Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751, 768–72 & n.25 (W. Va. 2014) (collecting cases). Underlying these cases is the rationale that sexually-harassing behavior is undertaken specifically for the benefit of the employee and is necessarily unrelated to his employer's objectives. *Zuidema*, 866 F. Supp. 2d at 937; *cf. Ballard v. Union Pac. R. Co.*, 781 N.W.2d 47, 53 & n.17 (Neb. 2010) (FELA case stating in dicta that there was no vicarious liability for sexually harassing conduct by employees who "were acting entirely upon their own impulses with no benefit to [their employer].")

In other words, sexual misconduct such as that alleged here is generally held not to have been actuated, at least in part, by a purpose to serve the employer. That is not to say that this Court subscribes "to the blanket proposition that sexual assaults never come within the scope of employment." *Doe v. Sipper*, 821 F. Supp. 2d 384, 388 (D.D.C. 2011). Instead, the Court looks to the facts of each case. And in this case, Pearce has not alleged facts plausibly suggesting that Helvering's alleged conduct was in any way motivated by a desire to further Werner's interests. *See, e.g.*, *id.* at 388–90; *Hunter v. Countryside Ass'n For the Handicapped, Inc.*, 710 F. Supp. 233,

239 (N.D. Ill. 1989). The Court therefore finds the Helvering's alleged acts fell outside the scope of his employment with Werner.

As an alternative theory of vicarious liability, Pearce asserts that Werner may be liable for Helvering's conduct under an "aided-by-agency" theory, as set forth in Rest. 2d Agency § 219(2)(d). That section provides:

> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> . . . .
>
> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, <u>or he was aided in accomplishing the tort by the existence of the agency relation.</u>[5]

Rest. 2d Agency § 219(2)(d) (emphasis supplied).

As can be seen from the emphasized language, subsection (2) consists of two clauses; the first addressing apparent authority and the second addressing what has come to be known as the "aided-by-agency" (or "aided-in-accomplishing") exception to the general rule of employer non-liability for torts of employees committed outside the scope of their employment.

There is a great deal of disagreement as to how broadly the aided-by-agency clause should be interpreted. The comments from the Restatement suggest a fairly narrow interpretation:

> Clause (d) includes <u>primarily</u> situations in which the principal's liability is based upon conduct which is within the <u>apparent authority</u> of a servant, as where one purports to speak for his employer in defaming another or interfering with another's business. Apparent authority may also be the basis of an action of deceit, and even physical harm. <u>In other situations, the servant may be able to cause harm because of his position as agent, as where a telegraph operator sends false messages purporting to come from third persons. Again, the manager of a store operated by him for an undisclosed principal is enabled to cheat the</u>

---

[5] Pearce also cites § 219(2)(b) as a basis for vicarious liability. Filing 18 at 21. But subsection (b) provides for direct liability based upon the employer's own negligence or recklessness, rather than vicarious liability for the employee's tortious conduct. *See*, *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 758–59 (1998); *Aguas v. State,* 107 A.3d 1250, 1259 (N.J. 2015); Rest 2d Agency § 219 cmt. e.

> customers because of his position. The enumeration of such situations is not exhaustive, and is intended only to indicate the area within which a master may be subjected to liability for acts of his servants not in scope of employment.

Rest. 2d § 219 cmt. e (citations omitted) (emphasis supplied). And, in fact, some courts have interpreted the "aided-by-agency" clause narrowly, reasoning that it was intended to address situations involving misrepresentation or deceit. *See, e.g.*, *Mahar v. StoneWood Transp.*, 823 A.2d 540, 545–46 (Me. 2003).

Other courts have taken the clause at face value and given it a broad interpretation, so that it reaches cases of misconduct by supervisory employees where their "tortious conduct is made possible or facilitated by the existence of the actual agency relationship." *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).[6] Even under these broader interpretations, vicarious liability will not lie merely because the supervisory employee's position gave him or her access or proximity to the victim. *See, Ayuluk v. Red Oaks Assisted Living, Inc.*, 201 P.3d 1183, 1200 (Alaska 2009); *VECO, Inc. v. Rosebrock*, 970 P.2d 906, 912–15 (Alaska 1999). But vicarious liability will lie if the supervisor took advantage of a "relationship with authority or control over the victim" that exists by virtue of the supervisor's relationship with the employer. *Ayuluk*, 201 P.3d at 1200; *see also Ocana*, 91 P.3d at 71–72.

Some courts have considered and rejected such a broad interpretation of § 219(2)(d). *See, e.g.*, *Zsigo v. Hurley Med. Ctr.*, 716 N.W.2d 220 (Mich. 2006). The *Zsigo* court reasoned that the general rule is that employers are not liable for the torts of their employees committed outside the scope of employment, but that § 219(2)(d) is phrased so vaguely and devoid of any limiting principles that it would be an exception so broad as to swallow the rule. *Id.* at 226–29. Still other courts have adopted the rule but only in extremely narrow circumstances, such as cases involving sexual misconduct by police officers who have abused their positions of trust and authority. *See,*

---

[6] *Faragher*, and its companion case decided the same day, *Ellerth*, 524 U.S. 742, involved the Court's interpretation of Title VII, which required the Court to look to "traditional principles of the law of agency in devising standards of employer liability in those instances where liability for the actions of a supervisory employee was not otherwise obvious." *Faragher*, 524 U.S. at 791–92. So, the Court turned to § 219(2)(d) as "an appropriate starting point" in its analysis, but cautioned that it was not embarking upon "a pronouncement of agency law in general." *Id.* at 802 & n.3. Rather, the Court's task was to "adapt agency concepts to the practical objectives of Title VII." *Id.* In other words, *Faragher* and *Ellerth* are not controlling in this case, which involves Nebraska common law agency principles, and not the federal common law of agency as adapted to meet the needs of Title VII.

*e.g.*, *Doe v. Forrest*, 853 A.2d 48 (Vt. 2004).[7] Given its broad wording and the fact that it has been in existence since 1958, it is somewhat surprising that § 219(2)(d) has not featured more prominently in the caselaw. But as the above discussion shows, when courts have been called upon to interpret or apply § 219(2)(d), they have reached widely differing results.

In the *Restatement (Third) of Agency* (2006), the American Law Institute (ALI) has distanced itself from § 219(2)(d), no trace of which appears in the new sections corresponding to § 219(2)(d). *See, e.g.*, Rest 3d Agency §§ 7.03–7.08. As the comments explain:

> This Restatement does not include "aided in accomplishing" as a distinct basis for an employer's (or principal's) vicarious liability. <u>The purposes likely intended to be met</u> by the "aided in accomplishing" basis are satisfied by a more fully elaborated treatment of apparent authority and by the duty of reasonable care that a principal owes to third parties with whom it interacts through employees and other agents. See § 7.05.

Rest. 3d Agency § 7.08 cmt. b (emphasis supplied).

Further explanation for the ALI's changed approach—if it even is a change from what the ALI actually intended in § 219(2)(d)—can be found in its soon-to-be-finalized Restatement of Employment Law. The commentary found therein goes even further in disapproving of the broad interpretation of § 219(2)(d), and suggests that it may have been the result of a drafting oversight:

> In both *Ellerth* . . . and *Faragher,* . . . the Supreme Court considered <u>ambiguous language</u> in § 219(2)(d) of the Restatement Second, Agency, as a basis other than apparent authority for holding an employer liable for an employee's wrongful acts committed outside the scope of employment. Section 219(2)(d) states that an employer may be liable for such acts if the employee "purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." Because the comma is placed (or misplaced) after "authority" rather than after "principal," some courts have interpreted § 219(2)(d) to mean that an employer may be vicariously liable for

---

[7] In a subsequent case, the Supreme Court of Vermont recognized the narrowness of its holding in *Forrest*, and refused to extend it even to a case involving sexual abuse of a child by a church pastor. *Doe v. Newbury Bible Church*, 933 A.2d 196 (Vt. 2007).

- 9 -

> an employee's acts committed outside the scope of employment if the employee was "aided in accomplishing the tort by the existence of the agency relation," regardless of whether the employee "purported to act or to speak on behalf of the principal." . . . .
>
> This broad reading of § 219(2)(d) seems incorrect. It makes the scope-of-employment limit superfluous. Almost all torts in the employment relationship are "aided" by the existence of that relationship, regardless of the tortfeasor's independent acts or motivation for committing them. The illustrations in § 219, Comment *e*, clarify that the "aided … by the existence of the agency relation" clause, like the apparent-authority clause, was meant to qualify the words "purported to act or to speak on behalf of the principal." Those illustrations indicate that the tortfeasor-employee must claim to be speaking or acting with authority delegated from a principal. In § 228, Comment *a*, of Restatement Second, Agency, the proper placement of the comma after "principal" makes this clearer: "a master may be liable if a servant speaks or acts, purporting to do so on behalf of his principal, and there is reliance upon his apparent authority or he is aided in accomplishing the tort by the existence of the agency relation."

Rest. Of Employment Law § 4.03 Reporters' Notes cmt. f (Proposed Final Draft April 8, 2014) (emphasis supplied).[8]

In this diversity case, the Court's task is to predict what the Supreme Court of Nebraska would make of § 219(2)(d). *See Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). The Supreme Court of Nebraska has, in the past, sought guidance from and approved several other sections of the Restatement (Third) of Agency. *See, Elting v. Elting*, 849 N.W.2d 444 (Neb. 2014); *Koricic v. Beverly Enterprises--Nebraska, Inc.*, 773 N.W.2d 145 (Neb. 2009). This Court predicts that the Supreme Court of Nebraska would do likewise in this case. Section 219(2)(d) has proven contentious and difficult to apply, and has been disavowed by its creators. Existing Nebraska caselaw does not, under these circumstances, support the adoption of a broad

---

[8] Despite these misgivings, in § 4.03, the ALI has adopted the holdings of *Faragher* and *Ellerth* as an "[o]ptional basis of liability for supervisor's or manager's actual or threatened abuse of authority outside the scope of employment." Rest. Of Employment Law § 4.03 cmt. g (Proposed Final Draft April 8, 2014). But the comments caution that this "formulation may not reflect how a particular state law will be interpreted, and applies to the extent authorized by applicable law."

exception to the requirement that an employee's torts be within the scope of their employment before the employer will be held vicariously liable.[9]

In sum, the Court finds that Helvering's alleged intentional torts were committed outside the scope of his employment with Werner. The Court further finds that, under the circumstances of this case, the Supreme Court of Nebraska would not adopt the aided-by-agency rule. Werner therefore cannot be held vicariously liable for Helvering's intentional torts, and Pearce's intentional tort claims in counts I through III will be dismissed. Pearce's remaining claims, for negligence against Werner, and for gender and disability discrimination and retaliation against Drivers, will proceed. Pearce has requested leave to amend her complaint, and she may do so, if she chooses, on or before August 12, 2015. Accordingly,

IT IS ORDERED:

1. Werner's motion to dismiss (filing 13) is granted in part and denied in part, as set forth above.

2. Pearce may submit an amended complaint, if she so chooses, on or before August 12, 2015.

Dated this 22nd day of July, 2015.

BY THE COURT:

*John M. Gerrard*

John M. Gerrard
United States District Judge

---

[9] There is no inconsistency between the use of the Restatement (Third) here and the use of Rest. 2d Agency § 228, in the scope of employment analysis above. Rest. 3d Agency § 7.07, the new counterpart to Rest. 2d Agency § 228, continues to require an inquiry into the employee's purpose, and holds that an "employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." Rest. 3d Agency § 7.07(2). "When an employee commits a tort with the sole intention of furthering the employee's own purposes, and not any purpose of the employer, it is neither fair nor true-to-life to characterize the employee's action as that of a representative of the employer." *Id.* cmt. b. In other words, the Court's scope of employment analysis would reach the same result under the updated Restatement.